769 S.E.2d 453

**CROSSMANN COMMUNITIES OF NORTH CAROLINA, INC.,
and Beazer Homes Investment Corp., Appellants,**

v.

**HARLEYSVILLE MUTUAL INSURANCE COMPANY,
Cincinnati Insurance Company, Defendants,**

**Of Whom Cincinnati Insurance Company is the Respondent.**

Appellate Case No. 2012–213245.

No. 5292.

Court of Appeals of South Carolina.

Heard Oct. 7, 2014.

Filed Jan. 28, 2015.

---

See also 401 S.C. 15, 736 S.E.2d 651.

508

David B. Miller, of Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers, P.A., of Myrtle Beach, and Martin M.

McNerney and Taylor T. Lankford, of King & Spalding, LLP, of Washington, D.C., for Appellants.

Franklin J. Smith, Jr., of Richardson, Plowden, Carpenter & Robinson, P.A., of Columbia, for Respondent.

SHORT, J.

In this insurance dispute, Crossmann Communities of North Carolina, Inc. (Crossmann) and Beazer Homes Investment Corp. (Beazer) (collectively, Appellants) appeal the trial court's order finding Cincinnati Insurance Company (Cincinnati) has no obligation to Appellants for costs incurred by Beazer to repair property damage at several condominium projects. Appellants argue the trial court erred in (1) determining commercial general liability (CGL) insurance policies underlying Cincinnati's umbrella policies were not exhausted and (2) finding Cincinnati was not bound by a 2007 judgment. We affirm.

FACTS

Between 1992 and 1999, Appellants and other contractors and subcontractors constructed multiple condominium projects in South Carolina and were subsequently sued by numerous homeowners alleging property damage arising from construction defects.[1] Appellants settled with the homeowners for approximately $16.8 million.[2] Appellants then filed a declaratory action seeking coverage for the settlement payments it made from numerous insurers, including Harleysville Mutual Insurance Company (Harleysville) under a series of CGL policies and Cincinnati under a series of CGL umbrella policies. Prior to trial, several of Appellants' other insurers settled with Appellants for $8.6 million, providing coverage for

---

1. *Crossmann Cmtys. of N.C., Inc. v. Harleysville Mut. Ins. Co.*, 395 S.C. 40, 44–45, 717 S.E.2d 589, 591–92 (2011) (*"Crossmann II"*). The South Carolina Supreme Court originally issued an opinion on January 7, 2011. *Id.* at 44, 717 S.E.2d at 591. The court withdrew that opinion and issued *Crossmann II*, finding the CGL policies provided coverage. *Id.*

2. The plaintiffs in the underlying lawsuits were condominium projects constructed between 1992 and 1998 in Horry County: River Oaks I, River Oaks II, Waterway Village at River Oaks, Buck Creek Golf Villas, and Lightkeepers Village/Rose.

the homeowners' claims. *Crossmann II*, 395 S.C. at 46 n. 2, 717 S.E.2d at 592 n. 2.

Harleysville provided Appellants CGL primary and excess coverage. The Harleysville primary policies provided a $1 million "each occurrence" limit and a $2 million "products completed operations aggregate" limit for the policy periods from 7/29/93 to 8/29/98. The Harleysville excess policies provided a $10 million "each occurrence" limit and an "aggregate limit" from July 29, 1994 to August 29, 1998. The Harleysville policies defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" and "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property."

Cincinnati provided excess umbrella policies for the policy periods from July 1, 1998 to July 1, 2002 and provided $10 million coverage for "each occurrence annual limit and annual aggregate limit." These policies defined "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions" and defined "property damage" as "[p]hysical injury to or destruction of tangible property[,] including all resulting loss of use."

The parties stipulated to the facts and amount of damages and presented only the coverage and allocation questions to the trial court. The jury panel was dismissed, and the trial court determined the coverage issue as a matter of law. The parties' stipulations, *inter alia,* were as follows:

1) If there is an "occurrence" or are "occurrences" under the Harleysville and Cincinnati policies (the "Policies"), then the damages at the underlying projects that resulted from water intrusion and that meet the definition of "property damage" in the Policies are $7.2 million. If the Court finds that there has been an occurrence or occurrences, then the Court shall find that [Appellants'] insured loss is $7.2 million. . . .

2) The parties agree that the damage referred to in paragraph 1 above began within 30 days after the Certificate of Occupancy was issued for each building and that such damage, and new damage, progressed until repaired or until

[Appellants] paid to settle the underling (sic) cases, whichever came first.

\* \* \*

6) Harleysville and Cincinnati agree that, for purposes of the disposition of this matter at the trial court level, they will not raise the applicability of policy exclusions with respect to [the trial court's] consideration of the issues identified below in paragraph 9. Harleysville and Cincinnati preserve the right to raise the applicability of policy exclusions on appeal to the extent permitted by the South Carolina Rules of Appellate Procedure and South Carolina law in response to contentions raised by [Appellants] that give rise to a policy exclusion.

7) The parties agree that the record in this case shall consist of all settlement documents, pleadings, discovery, and depositions, in both the coverage case and the underlying cases[,] which have been produced and exchanged in discovery in the case.

8) The parties agree that the following matters are the only issues of law to be addressed by [the trial court]:

a. Did the property damage giving rise to [Appellants'] claims for coverage arise from an "occurrence";

b. In the event the Court finds that there was an occurrence or occurrences, how shall the $7.2 million in insured damages referred to in paragraph 1 above be allocated, whether by "joint and several" or by "time on the risk";

c. In the event judgment is entered for [Appellants], and that the Court determines that "time on the risk" is the proper allocation method, what is the proper period over which the "time on the risk" should be calculated. All parties reserve their right to argue, from the applicable facts and law, the appropriate start date and end date for any *pro rata* time on the risk allocation period . . . .

\* \* \*

9) The parties agree that Cincinnati can argue to the Court that the underlying insurance has not been exhausted and that Cincinnati has no obligation to "drop down" and cover [Appellants] for losses in the Underlying Lawsuits, and [Appellants] can oppose Cincinnati's contention and argue that Cincinnati's policies are presently triggered.

10) The parties agree that all rights to appeal are preserved as to any and all rulings and judgments of the trial court. * * *

13) Cincinnati's applicable policies are excess policies with a "follow from" endorsement applicable to completed operations.

At the first hearing on remand, the trial court asked the parties if the stipulations remained the "status quo, a part and partial [sic] of this case." All parties agreed they did.

By order filed May 3, 2007, the trial court found, *inter alia*, (1) coverage because "property damage" arose from an "occurrence" under the Harleysville and Cincinnati policies; (2) the parties had stipulated the loss was $7.2 million; (3) the condominium projects sustained "property damage" during the policy periods; (4) damages against Harleysville in the amount of $7.2 million and entered judgment accordingly; and (5) because the combined limits of the Harleysville policies exceeded the $7.2 million in stipulated damages and the damages were to be allocated in accordance with the joint and several methodology, the court need not rule on whether the Cincinnati excess/umbrella policies were triggered. Harleysville appealed the 2007 order. Cincinnati did not appeal.

Our supreme court affirmed the trial court's finding of coverage, but it reversed the trial court's finding that damages were to be allocated by the joint and several liability method. *Crossmann II*, 395 S.C. at 66–67, 717 S.E.2d at 603. Instead, the supreme court found Harleysville's liability was limited to its pro rata share of the losses based on the "time on the risk" allocation of liability method. *Id.* at 63, 717 S.E.2d at 601. The court found the standard CGL policy

require[s] that each insurer cover only that portion of a loss attributable to property damage that occurred during its policy period. In light of the difficulty in proving the exact amount of damage incurred during each policy period, we adopt the [time-on-risk] formula ... as the default method for allocating shares of the loss.... [T]he premise [is] that each insurer is responsible only for a pro rata portion of the total loss, and each pro rata portion must be defined by the insurer's time on the risk.

*Id.* at 66, 717 S.E.2d at 603. Thus, the court remanded the action to the trial court for a determination of Harleysville's liability. *Id.* at 67, 717 S.E.2d at 603. The court stated:

> We leave it to the sound discretion of the trial court to determine whether it is necessary to apply the "time on risk" formula separately to each individual building or whether, instead, it would be prudent to modify the default formula to arrive at a reasonable methodology for this case. Thus, we emphasize that trial courts employing the "time on risk" approach may alter the default formula ... where a strict application would be unduly burdensome or otherwise inappropriate under the circumstances of a particular case.

*Id.* at 66, 717 S.E.2d at 602. The court noted:

> Prior to the trial court's decision, Crossmann consented to the dismissal of its claims against Defendant Associated Insurors, Inc.
>
> Defendant Cincinnati Insurance Company only issued excess insurance policies to Crossmann. Because the trial court found Harleysville's policies were sufficient to indemnify the entire $7.2 million in stipulated damages, it did not rule on whether Cincinnati's policies provided coverage, though it did find that the homeowners in the underlying lawsuits suffered property damage during Cincinnati's policy periods.

*Id.* at 44 n. 1, 717 S.E.2d at 591 n. 1.

On remand, the trial court held hearings in 2012 on January 5 and March 1. By order dated May 23, 2012, the trial court found Harleysville's pro rata share of the $7.2 million in stipulated damages to be $1,580,146. In a separate order also dated May 23, 2012, the court found Cincinnati's excess policies were not triggered because the underlying CGL policies were not exhausted, and Cincinnati was not precluded from litigating this issue by not appealing the 2007 judgment. The court found Cincinnati's excess policies provided coverage between May 29, 1998, and September 1, 2002. The court found because the Cincinnati policy is a "follow from" policy under Stipulation 13, the potentially covered damages in the settling carriers' policies and the excess policies were similar. Finally, the court looked to the clauses in Cincinnati's policies reinforcing the excess nature of the policies, including the

"Other Insurance" provision, which stated, "[t]he insurance provided by this policy is excess over any other valid and collectible insurance, other than insurance written specifically to be excess over this insurance, and shall not be contributory." The policies also included a "Limits of Insurance" clause, which provided as follows:

a. If the limits of "underlying insurance" have been reduced by payment of claims, this policy will continue in force as excess of the reduced "underlying insurance"; or

b. If the limits of "underlying insurance" have been exhausted by payment of claims, this policy will continue in force as "underlying insurance." Section III, 4(a),(b).

Thus, the trial court found the Cincinnati polices could be triggered only if the underlying policies were exhausted by either paying the full limits available or by Appellants funding the difference between a settlement for less than the full limits and the limits of the relevant policies. The court found the excess policies would be triggered if the amount of the damages paid in settlement of the underlying cases, as calculated using the "time on risk" method, exceeded the limits of the underlying insurance for each policy period.

Crossmann paid a total of $16,770,750 to settle the underlying lawsuits. In Stipulation 1, the parties stipulated to $7.2 million in "property damage" resulting from water intrusion if there was an "occurrence" under the Harleysville and Cincinnati polices. The trial court found the balance, $9,570,750, represented the cost to repair "defective construction." The court noted: "While [Appellants] argue[ ] that the measure of Cincinnati's potential liability should be ... $16,770,750[,] ... the Court is bound by the parties' Stipulation that the potentially covered damages are $7.2 million."

The underlying policies each provided $1 million, per occurrence, per year; $2 million, annual aggregate for the following periods:

| | |
|---|---|
| Indiana [3] | 5/29/98 to 8/29/98 |
| Massachusetts Bay | 8/29/98 to 8/29/00 |
| Regent | 8/29/98 to 1/1/02 |

**3.** Indiana's policy was effective beginning July 1, 1997, until August 29, 1998, but it only covered Appellants between May and August of 1998, for a total of ninety-six days.

Utilizing the default rule from *Crossmann II* that assumes damage occurs in equal portions during each year that it progresses, the court evenly allocated the damages from the period of thirty days after the Certificate of Occupancy (CO) was issued until repairs were completed or the underlying lawsuits were settled.

The court compared the amount of the settlement in each case to the total settlement amount of $16,770,750; applied that percentage to the stipulated damages of $7.2 million; and arrived at a pro rata allocation of stipulated damages. The court then applied a daily calculation of loss (Loss/Day) using the stipulated damages:

| Project | Stipulated Damages | Average Days of Progressive Loss | Loss/Day |
|---------|--------------------|----------------------------------|----------|
| River Oaks I | $3,187,440 | ÷ 3,659 | = $871 |
| River Oaks II | $1,213,200 | ÷ 2,592 | = $468 |
| Waterway | $1,684,800 | ÷ 3,316 | = $508 |
| Buck Creek | $941,760 | ÷ 3,730 | = $252 |
| Lightkeepers Village/Rose | $172,800 | ÷ 4,707 | = $37 |
| | | Total Loss/Day | $2,136 |

The court finally compared the Loss/Day of $2,136 to the daily underlying policy limits, finding the daily underlying coverage to be $2,740. Because the daily underlying coverage was more than the Loss/Day, the court found the excess coverage was not triggered. Appellants moved for reconsideration. After an August 27, 2012 hearing, the trial court denied the motion to reconsider. This appeal followed.[4]

## STANDARD OF REVIEW

■■■ "The standard of review in a declaratory action is determined by the underlying issues." *Nationwide Mut. Ins. Co. v. Rhoden,* 398 S.C. 393, 398, 728 S.E.2d 477, 479 (2012). If the dispute is an action to determine whether coverage exists under an insurance policy, the action is one at law. *Id.* In an action at law, tried without a jury, the appellate court will not disturb the trial court's findings of fact unless they are found to be without evidence that reasonably supports those

---

4. After the circuit court issued its May 23, 2012 order, Appellants and Harleysville "resolved their disputes"; thus, Harleysville is not involved in this appeal.

findings. *Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). "Where the action presents a question of law, as does this declaratory action, this Court's review is plenary and without deference to the trial court." *Crossmann II,* 395 S.C. at 47, 717 S.E.2d at 592.

## LAW/ANALYSIS

### I. Exhaustion

Appellants argue the trial court erred in finding the underlying CGL policy limits were not exhausted; therefore, it erred in finding coverage under Cincinnati's policies was not triggered. We disagree.

■ Appellants maintain the limits of the underlying policies have been exhausted under the joint and several method of allocation and Cincinnati's liability is $5,619,854. Appellants argue because coverage for "property damage" under the Cincinnati policies "applies anywhere" and the "underlying insurance" definition includes "any type of self-insurance or alternative method by which the insured arranges for funding of legal liabilities that affords coverage that this policy covers," the policies were triggered when the limits of the underlying policies were paid by (1) the underlying insurers, (2) Appellants, or (3) a combination of the underlying insurers and Appellants. Thus, Appellants argue payments made to claimants in states other than South Carolina should have been considered in determining whether the underlying policy limits were exhausted.[5]

In its order denying Appellants' motion to reconsider, the trial court addressed this issue, stating:

> While it is undisputed that [Appellants] paid substantial sums to settle claims in other jurisdictions, [Appellants] failed to demonstrate what portion of the monies paid, if any, were for covered claims as set forth in *Crossmann II* . . . . Further, [Appellants have] failed to identify what part of any alleged covered claims would be allocated to the Cincinnati policy periods utilizing the pro rata/time on risk

---

5. Appellants allege they paid $42.7 million in Indiana and more than $13 million in Kentucky to settle homeowner construction defect claims.

methodology as set forth in *Crossmann II.* Only "property damages" caused by an "occurrence" that occurred during Cincinnati's policy period would act to exhaust the underlying CGL limits.

In an effort to show that the amounts paid to settle cases in other states should be considered in this litigation, [Appellants rely] on statements contained in [their] Answers to Interrogatories.... [Appellants] did not state in [their] discovery response that any property damage was caused by an "occurrence" as defined in *Crossmann II* or that it occurred during Cincinnati's policy period. Further, during the August 27, 2012 hearing [on the motion to reconsider], [Appellants] did not present any evidence to the Court that any property damage in the Indiana and Kentucky cases was caused by an "occurrence" as defined in *Crossmann II* or that it occurred during Cincinnati's policy period.

Thus, the court denied the motion to reconsider regarding payments to resolve claims in states other than South Carolina.

Appellants rely on an affidavit of W. Mark Berry, a former Beazer [6] officer, who testified regarding the settlement negotiations and claims made in other states. Berry stated the following: "Beazer has expended over $27,770,073 through January 2006 for remediation of *property damage* in connection with the settlement of the [Indiana lawsuits]...." (emphasis added). Based on Berry's use of the phrase "property damage" in his affidavit, Appellants claim the payments made were to remedy property damage as defined by the underlying policies, thereby triggering the Cincinnati excess policies.

Appellants also rely on summaries of damage claims paid in the Indiana and Kentucky litigations. Appellants claim payments of $42.7 million in the Indiana litigation and more than $13 million in the Kentucky litigation. They further claim Beazer's settlement with Cincinnati in the other state litigation [7] is "strong evidence that even Cincinnati believes the Underlying Insurance is exhausted." In addition, Appellants

---

6. Beazer acquired Crossmann in April 2002.

7. Cincinnati paid Appellants $11 million in settlement for losses in Indiana and Kentucky under these policies.

claim Cincinnati was required to dispute their submission of the damages paid in the other state litigation.

We find Appellants' reliance misplaced. Appellants submitted no information specifying the portions of these payments that related to property damage as defined under the policies compared to the costs related to defective construction, which were not covered under the polices. The burden of proof in a declaratory judgment action rests on the plaintiff. *Martin v. Cantrell*, 225 S.C. 140, 144, 81 S.E.2d 37, 38–39 (1954). We find no error by the trial court in rejecting Appellants' bare assertion that all of the claims paid in the other state litigations arose from property damage, and we find no justification for abrogating the stipulations.

■ Appellants also claim because the stipulations were not signed by the underlying insurers and it is undisputed Appellants paid $16.8 million to resolve the underlying lawsuits in South Carolina, those insurers were obligated for the entire $16.8 million; thus, Appellants should be able to claim the entire $16.8 million in resolving its dispute toward exhaustion. We disagree.

■ "A stipulation is an agreement, admission or concession made in judicial proceedings by the parties thereto or their attorneys." *Kirkland v. Allcraft Steel Co.*, 329 S.C. 389, 392–93, 496 S.E.2d 624, 626 (1998). "Stipulations, of course, are binding upon those who make them." *Id.* (citing 73 Am.Jur.2d *Stipulations* § 8, at 543 (1974)); *see Belue v. Fetner*, 251 S.C. 600, 606, 164 S.E.2d 753, 755 (1968) ("When counsel enter into an agreed stipulation of fact as a basis for decision by the court, both sides will be bound by such agreed stipulation, and the court will not go beyond such stipulation to determine the facts upon which the case is to be decided."); *see also Indep. Grain Dealers Mktg. Ass'n v. Beard*, 284 S.C. 309, 312, 326 S.E.2d 169, 171 (Ct.App.1985) ("When the parties entered into an agreed stipulation of fact as basis for the decision by the master, both were bound by the stipulations and the master could not go beyond the stipulations to determine the facts upon which the case was to be decided.").

■ "A stipulation will not be enforced if it is contradictory and confusing and stands in the way of a true determina-

tion of the parties['] rights or where it is subject to different constructions and there is a disagreement as to what was intended to be included therein." *Suddeth v. Knight,* 280 S.C. 540, 544-45, 314 S.E.2d 11, 14 (Ct.App.1984). However, a stipulation will not be abrogated without "the written consent of both parties, or one of the parties has been relieved from its operation by an order of the Court based upon such a showing as satisfies the Court that the interests of justice require that he should be so relieved." *Brown v. Pechman,* 55 S.C. 555, 567, 33 S.E. 732, 737 (1899).

In this case, Stipulation 1 provided if there is an "occurrence," "the damages at the underlying projects that resulted from water intrusion and that meet the definition of property damage in the Policies are $7.2 million." Harleysville, Cincinnati, and Appellants were the signatories on the stipulations. There was no agreement to abrogate this stipulation,[8] and Appellants provided no basis requiring the trial court to abrogate the stipulation in the interest of justice.

At the time the stipulations were agreed upon, the parties had not determined the issue of whether there was an "occurrence." The question of whether the underlying policies would be exhausted was in dispute. Furthermore, Appellants have not shown what portion of the payments made in Indiana and Kentucky constituted "property damage" and what portion was for defective construction, which was not covered under the underlying or Cincinnati policies. *See Crossman II,* 395 S.C. at 49, 717 S.E.2d at 593 (emphasizing the difference between a claim for the cost of repairing defective work, which is not a claim for property damage and a claim for the costs of repairing damage caused by defective work, which is a claim for property damage). We find the trial court's analysis is consistent with our supreme court's analysis in *Crossmann II.* Further, we find the trial court correctly used the stipulated damages in assessing whether the underlying policies had been exhausted.

Appellants next argue Stipulation 1, which states property damage is $7.2 million, related to coverage only

---

**8.** In fact, at the first hearing on remand, Appellants specifically agreed the stipulations remained the "status quo, a part and partial [sic] of this case."

under the Cincinnati and Harleysville policies and does not determine exhaustion regarding payments of South Carolina claims made by other insurers or payments of claims made in other state litigations. We disagree.

Stipulation 8 provides the following: "The parties agree that the following matters are the only issues of law to be addressed by [the trial court]. . . . (b) In the event the Court finds that there was an occurrence or occurrences, how shall the $7.2 million in insured damages referred to in paragraph 1 above be allocated . . . ?" We find the stipulations clear, unambiguous, and binding on Appellants.

▪▪▪▪ Appellants argue in the alternative that under the time-on-the-risk methodology, Cincinnati is still obligated to pay $3,038,300. Citing *Liberty Mutual Fire Insurance Co. v. J.T. Walker Industries, Inc.*, 817 F.Supp.2d 784, 789 (D.S.C. 2011), Appellants argue all the property damage that takes place in a single policy year is a separate occurrence. We disagree.

In *J.T. Walker,* the district court stated: "The only interpretation of 'occurrence' able to reconcile all of the policy language in a manner consistent with *Crossmann II* is that all of the damage that happens in one policy year constitutes a single 'occurrence,' and therefore progressive environmental damage creates 'a "separate" occurrence in each policy year.' " 817 F.Supp.2d at 789 (quoting *Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*, 179 N.J. 87, 843 A.2d 1094, 1105 (2004)).

The method of allocation first considered by the trial court was the default rule from *Crossmann II*, assuming damage occurs in equal portions during each year that it progressed. *Crossmann II*, 395 S.C. at 64–65, 717 S.E.2d at 602. The trial court then computed the pro rata allocation based on a daily loss rather than an annual loss because Indiana had coverage for less than a year and Regent had coverage for less than two years. The trial court noted this was the methodology originally advanced by Appellants.

We find no error in the methodology employed by the trial court. As articulated in *Crossmann II,* the default rule is subject to alteration *at the discretion of the trial court:*

This formula is not a perfect estimate of the loss attributable to each insurer's time on the risk. Rather, it is a *default rule* that assumes the damage occurred in equal portions during each year that it progressed. If proof is available showing that the damage progressed in some different way, then the allocation of losses would need to conform to that proof. However, absent such proof, assuming an even progression is a logical default.

In this case, a strict application of the basic "time on risk" formula might be inappropriate. There were numerous buildings involved in the underlying lawsuit against Crossmann, each with its own certificate of occupancy, and the parties have stipulated that the damage began "within 30 days after the Certificate of Occupancy was issued for each building." Further, the parties stipulated that the damage "progressed until repaired or until Beazer Homes paid to settle the underlying cases, whichever came first." Accordingly, it may be that, as to each building, each policy was "on the risk" for a slightly different proportion of the total damage period. We leave it to the sound discretion of the trial court to determine whether it is necessary to apply the "time on risk" formula separately to each individual building or whether, instead, it would be prudent to modify the default formula to arrive at a reasonable methodology for this case. Thus, we emphasize that trial courts employing the "time on risk" approach may alter the default formula set forth above where a strict application would be unduly burdensome or otherwise inappropriate under the circumstances of a particular case. However, any such alterations must remain within the bounds of a pro rata/"time on risk" approach: the formula must result in a reasonable approximation of the amount of property damage that occurred during each insurer's policy period.

*Id.* at 65–66, 717 S.E.2d 589, 602.

 Finally, Appellants argue the excess policies should be triggered whether the payments made to determine exhaustion derived from underlying insurers, settlements paid by Appellants, or both as was found by the Seventh Circuit Court of Appeals in lawsuits against Beazer in Indiana. *See Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 659 (7th Cir.2010) (citing Indiana public policy favoring out-of-

court settlement and finding other interpretation would deter parties who have both CGL and excess insurance from settling with their CGL insurers). We disagree.

We find the origin of the payments is irrelevant in this case where the stipulated damages were $7.2 million and Appellants settled with the underlying insurers for $8.6 million. The excess coverage is not triggered because the stipulated property damage has been paid, not because of who made the payments. We find no error by the trial court in the method of calculation utilized to determine Cincinnati's excess coverage was not triggered.

## II. 2007 Judgment

Appellants argue the trial court erred in reversing its joint and several allocation method as to Cincinnati because Cincinnati did not appeal the 2007 judgment. Relying on the doctrine of law of the case, Appellants argue the trial court erred in applying the time on the risk allocation method rather than the joint and several allocation method. According to Appellants, Cincinnati's failure to either appeal the 2007 judgment or raise the law of the case issue in its remand briefs indicated an acceptance of the joint and several liability allocation method. We disagree.

Under the law of the case doctrine, "[a]n unappealed ruling is the law of the case and requires affirmance." *Transp. Ins. Co. & Flagstar Corp. v. S.C. Second Injury Fund,* 389 S.C. 422, 431, 699 S.E.2d 687, 691 (2010); *see Buckner v. Preferred Mut. Ins. Co.,* 255 S.C. 159, 160–61, 177 S.E.2d 544, 544 (1970) (finding an unchallenged ruling, "right or wrong, [was] the law of th[e] case"). "The doctrine of the law of the case applies to an order or ruling which finally determines a substantial right." *Shirley's Iron Works, Inc. v. City of Union,* 403 S.C. 560, 573, 743 S.E.2d 778, 785 (2013) (internal quotations marks omitted). The law of the case doctrine applies to issues explicitly decided and issues necessarily decided in the former case. *Sloan Constr. Co. v. Southco Grassing, Inc.,* 395 S.C. 164, 170, 717 S.E.2d 603, 606 (2011).

We find the law of the case doctrine does not apply in this case. First, the parties specifically stipulated in Stipulation

8(c) that if "time on the risk" was determined to be the proper allocation method, "[a]ll parties reserve their right to argue, from the applicable facts and law, the appropriate start date and end date for a pro rata time on the risk allocation period." In Stipulation 9, "[t]he parties agree[d] that Cincinnati can argue . . . that the underlying insurance has not been exhausted. . . ." In addition, the 2007 judgment did not explicitly or necessarily decide the issue of whether the underlying policies had been exhausted, thereby triggering Cincinnati's excess coverage. We find no merit to Appellants' law of the case argument.

## CONCLUSION

For the foregoing reasons, the order on appeal is **AFFIRMED**.

HUFF and KONDUROS, JJ., concur.