# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Harleysville Group Insurance, a Pennsylvania Corporation, Appellant/Respondent,

v.

Heritage Communities, Inc., a South Carolina Corporation; Heritage Magnolia North, Inc., a South Carolina Corporation; Buildstar Corporation, a South Carolina Corporation; Magnolia North Horizontal Property Regime; Magnolia North Property Owners Association, Inc., a South Carolina Corporation; and National Surety Corp., Defendants,

Of whom Heritage Communities, Inc., a South Carolina Corporation; Heritage Magnolia North, Inc., a South Carolina Corporation; Buildstar Corporation, a South Carolina Corporation; and National Surety Corp. are Respondents,

and Magnolia North Horizontal Property Regime and Magnolia North Property Owners Association, Inc., a South Carolina Corporation, are Respondents/Appellants.

Appellate Case No. 2013-001281


And

Harleysville Group Insurance, a Pennsylvania Corporation, Appellant/Respondent,

v.

Heritage Communities, Inc., a South Carolina Corporation; Heritage Riverwalk, a South Carolina Corporation; Buildstar Corporation, a South Carolina

Corporation; Riverwalk at Arrowhead Country Club Horizontal Property Regime; Riverwalk at Arrowhead Country Club Property Owners Association, Inc., a South Carolina Corporation; National Surety Corp.; and Tony L. Pope and Lynn Pope, individually and representing as a class all unit owners at Riverwalk at Arrowhead Country Club Horizontal Property Regime, Defendants,

Of whom Heritage Communities, Inc., a South Carolina Corporation; Heritage Riverwalk, a South Carolina Corporation; Buildstar Corporation, a South Carolina Corporation; National Surety Corp.; and Tony L. Pope and Lynn Pope, individually and representing as a class all unit owners at Riverwalk at Arrowhead Country Club Horizontal Property Regime, are Respondents,

and Riverwalk at Arrowhead Country Club Horizontal Property Regime and Riverwalk at Arrowhead Country Club Property Owners Association, Inc. are Respondents/Appellants.

Appellate Case No. 2013-001291

Appeal from Horry County
John M. Milling, Special Referee

Opinion No. 27698
Heard January 14, 2016 – Filed January 11, 2017

**AFFIRMED AND AFFIRMED AS MODIFIED**

C. Mitchell Brown, William C. Wood, Jr., and A. Mattison Bogan, all of Nelson Mullins Riley & Scarborough, LLP, of Columbia; and Robert C. Calamari, of Nelson Mullins Riley & Scarborough, of Myrtle Beach, for Appellant/Respondent.

John P. Henry and Philip C. Thompson, Sr., both of Thompson & Henry, P.A., of Conway, for Respondents/Appellants.

——————

**JUSTICE KITTREDGE:** These cases present cross-appeals from declaratory judgment actions to determine coverage under Commercial General Liability (CGL) insurance policies issued by Harleysville Group Insurance (Harleysville). These cases arise from separate actions, but we address them in a single opinion as they involve virtually identical issues regarding insurance coverage for damages stemming from the defective construction of two condominium complexes in Myrtle Beach: Magnolia North Horizontal Property Regime (Magnolia North) and Riverwalk at Arrowhead Country Club Horizontal Property Regime (Riverwalk). The Special Referee found coverage under the policies was triggered and calculated Harleysville's pro rata portion of the progressive damages based on its time on the risk. We affirm the findings of the Special Referee in the Magnolia North matter, and we affirm as modified in the Riverwalk matter.

## I.

The Riverwalk and Magnolia North developments were constructed between 1997 and 2000. After construction was complete and the units were sold, the purchasers became aware of significant construction problems, including building code violations, structural deficiencies, and significant water-intrusion problems. In 2003, the purchasers filed suit to recover damages for necessary repairs to their homes.

The lawsuits were filed by the respective property owners' associations (the POAs), which sought actual and punitive damages for the extensive construction defects under theories of negligent construction, breach of fiduciary duty, and breach of warranty.[1] As to the Riverwalk development, individual homeowners

------

[1] The Magnolia North trial involved claims of negligent construction, breach of implied warranty of workmanlike service, and breach of fiduciary duty for failing to repair or fund repairs needed in the common areas at the time the property was turned over to the POA. In the Riverwalk litigation, the POA asserted similar claims of negligence and breach of fiduciary duty.

also filed a class action to recover damages for the loss of use of their property during the repair period.[2]  The defendants in the underlying suits were the related corporate entities that developed and constructed the condominium complexes: Heritage Communities, Inc. (the parent development company), Heritage Magnolia North, Inc. and Heritage Riverwalk, Inc. (the project-specific subsidiary companies for each separate development), and Buildstar Corporation (the general contracting subsidiary that oversaw construction of all Heritage development projects), to which we refer collectively as "Heritage."

During the period of construction from 1997 to 2000, the various Heritage entities each maintained several liability insurance policies with Harleysville with per-occurrence limits totaling between $3,000,000 and $4,000,000 on the primary policies and between $9,000,000 and $13,000,000 on the excess liability policies.[3] Heritage was uninsured after the last policy lapsed in 2001, and the financial strain of numerous construction-defect lawsuits caused Heritage to go out of business in 2003.[4]

After receiving notice of the lawsuits, Harleysville informed its insureds that it

---

[2] This class action was consolidated for trial with the Riverwalk POA suit.

[3] Between August 1997 and November 1999, Heritage Communities, Inc. maintained various policies with $1,000,000 in primary liability coverage and $4,000,000 in excess coverage. From April 1997 to August 2000, BuildStar Corporation maintained $1,000,000 of coverage in both primary and excess policies.  From June 1997 to June 2001, Heritage Riverwalk, Inc. maintained policies of $1,000,000 in primary coverage and $4,000,000 in excess coverage. From September 1998 to November 2000, Heritage Magnolia North maintained $1,000,000 in liability coverage and $4,000,000 in excess coverage.

[4] In January 2001, Heritage Communities, Inc., the parent development company, filed for protection under Chapter 11 of the United States Bankruptcy Code and thereafter was administratively dissolved by the South Carolina Secretary of State in June 2011.  *See* S.C. Code Ann. § 33-14-210(d) (2006) ("A corporation dissolved administratively continues its corporate existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs.")  The remaining corporate entities, though not officially dissolved, have ceased operations.

would provide for their defense; however, Harleysville contends this was done under a full reservation of rights. Harleysville's efforts to reserve its rights were generic statements of potential non-coverage coupled with furnishing most of the Heritage entities with copies (through a cut-and-paste method) of the insurance policies. There is no dispute that Harleysville would control the litigation. Harleysville contends that all coverage issues would be litigated following the entry of any adverse jury verdict.

At the outset of each trial, Harleysville's counsel for Heritage conceded liability, and in both trials, the trial court directed a verdict in favor of the POA on the negligent construction cause of action. *See Magnolia North Prop. Owners' Ass'n v. Heritage Cmtys.*, 397 S.C. 348, 369–70, 725 S.E.2d 112, 123–24 (Ct. App. 2012) (observing that "during opening arguments, counsel [for Heritage] conceded liability" and affirming the trial court's decision to direct a verdict in favor of the POA); *Pope v. Heritage Cmtys.*, 395 S.C. 404, 429–30, 717 S.E.2d 765, 778–79 (Ct. App. 2011) (quoting Heritage's concessions of liability during opening statements and finding no error in the trial court's decision to direct a verdict in favor of the POA). Thus, the only contested issue in the underlying trials was the nature and extent of the damages resulting from the admitted negligent construction.

In this regard, the parties presented various experts who offered widely different estimates of the costs to correct the construction defects. According to the POAs' experts, the cost of necessary repairs totaled approximately $9,200,000 at Magnolia North and $8,600,000 at Riverwalk. In contrast, defense experts testified the necessary repairs would cost much less—approximately $2,400,000 at Magnolia North and $2,500,000 at Riverwalk. Ultimately, the juries declined to adopt any one expert's estimate, instead returning verdicts somewhere between the parties' figures. In the Magnolia North matter, the jury returned a general verdict for $6,500,000 in actual damages and $2,000,000 in punitive damages, and in the Riverwalk suit, the jury returned a general verdict of $4,250,000 in actual damages and $250,000 in punitive damages in favor of the POA and $250,000 in loss-of-use damages and $750,000 in punitive damages in the class action.

Following these general jury verdicts against its insureds, Harleysville filed the present declaratory judgment actions to determine what portion of the judgments in the underlying construction-defect lawsuits would be covered under Heritage's CGL policies. In filing these suits, Harleysville contended that, under the terms of the policies, it has no duty to indemnify Heritage for these judgments.

Alternatively, if any of the damages were found to be covered, Harleysville sought an accounting to somehow parse the jury verdicts and determine which portion of the juries' general verdicts constituted covered damages. Harleysville further argued it could be responsible for only that portion of damages occurring during the period of time its policies provided coverage.

The matter was referred to a Special Referee, who held an evidentiary hearing in December 2010. Because this Court's decision in *Crossmann Communities of North Carolina, Inc. v. Harleysville Mutual Insurance Co.*[5] was pending at the time, the parties agreed for the Special Referee to stay the matter until *Crossmann* was resolved. After *Crossmann* was decided in August 2011, the parties agreed for the Special Referee to reopen the evidentiary hearing in December 2011 to hear arguments and testimony regarding the applicability of the time-on-the-risk formulation as set forth in *Crossmann*. The POAs objected to the admission of evidence regarding time on the risk, arguing that it was inappropriate to parse the juries' general, unallocated verdicts by evaluating Harleysville's time on the risk.

Ultimately, the Special Referee found coverage under the policies was triggered because the juries' general verdicts included some covered damages. Although the Special Referee found that the costs to remove and replace the faulty workmanship were not covered under the policies, the Special Referee concluded that it would be improper and purely speculative to attempt to allocate the juries' general verdicts between covered and non-covered damages. Accordingly, the Special Referee ordered the full amount of the actual damages in the construction-defect suits would be subject to Harleysville's duty to indemnify in proportion with its time on the risk. The Special Referee made factual findings regarding the dates of the progressive damages period and the period during which Harleysville provided coverage. The Special Referee thereafter calculated Harleysville's pro rata portion of the progressive damages based on Harleysville's time on the risk. Lastly, the Special Referee found punitive damages were covered and that no policy exclusion applied to preclude coverage for any portion of those damages.

The parties subsequently filed cross-appeals. Harleysville is the primary Appellant. Upon the parties' joint motion, these matters were certified from the court of appeals to this Court pursuant to Rule 204(b), SCACR.

**II.**

---

[5] 395 S.C. 40, 717 S.E.2d 589 (2011).

"A declaratory judgment action is neither legal nor equitable, and therefore, the standard of review is determined by the nature of the underlying issue." *Auto Owners Ins. Co. v. Newman*, 385 S.C. 187, 191, 684 S.E.2d 541, 543 (2009) (citing *Colleton Cnty. Taxpayers Ass'n v. Sch. Dist. of Colleton Cnty.,* 371 S.C. 224, 231, 638 S.E.2d 685, 688 (2006)). "When the purpose of the underlying dispute is to determine whether coverage exists under an insurance policy, the action is one at law." *Id.* (citing *Auto-Owners Ins. Co. v. Hamin,* 368 S.C. 536, 540, 629 S.E.2d 683, 685 (Ct. App. 2006)). "In an action at law tried without a jury, the appellate court will not disturb the trial court's findings of fact unless there is no evidence to reasonably support them." *Id.* Indeed, this Court's scope of review "'is limited to correcting errors of law.'" *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 382 S.C. 535, 543, 677 S.E.2d 574, 578 (2009) (quoting *State Farm Mut. Auto. Ins. Co. v. James,* 337 S.C. 86, 93, 522 S.E.2d 345, 348–49 (Ct. App. 1999)).

The threshold question in determining coverage under a CGL policy is whether the claim at issue is for "property damage" caused by an "occurrence" within the general grant of coverage in the CGL insuring agreement. Specifically, the CGL policies at issue in these cases provide:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" [or] "property damage" . . . to which this insurance applies. . . .
>
> a. This insurance applies only:
>
>   (1) To "bodily injury" or "property damage":
>
>     (a) That occurs during the policy period; and
>
>     (b) That is caused by an "occurrence." [6]

---

[6] The language of the excess liability policies is similar and provides:

> We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages because of:

The CGL policies define "property damage" as "physical injury to tangible property, including all resulting loss of use of that property," and define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[7]  Applying these terms to ascertain the scope of coverage in construction-defect cases has resulted in considerable litigation, not just in South Carolina, but across the country.

In *L-J, Inc. v. Bituminous Fire & Marine Insurance Co.*, 366 S.C. 117, 621 S.E.2d 33 (2005), this Court explored the issue in determining whether costs to repair negligently constructed roadways were covered under the general contractor's CGL policy.  *Id*. at 122, 621 S.E.2d at 35.  Observing there was no claimed damage to property other than to the defectively constructed roadway—in other words, the completed work itself—this Court held the claimed losses were not covered by the CGL policy.  *Id*. at 123–24, 621 S.E.2d at 36–37.  However, in *L-J*, we foreshadowed that the coverage question would be resolved differently under different circumstances.  Specifically, we explained that where a claimed loss is for damage to property other than the faulty workmanship itself, such as where continuous or repeated water intrusion causes damage to otherwise non-defective construction components, then the claim may be covered under the terms of the policy, as it would not constitute a mere allegation of faulty or defective workmanship.  *Id*. at 123–24, 621 S.E.2d at 36 (citing *High Country Assocs. v. N.H. Ins. Co*., 648 A.2d 474 (N.H. 1994)).

Consistent with our projection in *L-J*, several years later in *Auto Owners Insurance Co. v. Newman*, 385 S.C. 187, 684 S.E.2d 541 (2009), we held that a subcontractor's negligent application of stucco, which allowed water to seep into the plaintiff's home causing damage to the home's framing and exterior sheathing, constituted an occurrence under the builder's CGL policy.  Although the Court found the damages caused by the continuous moisture intrusion resulting from this negligent construction were covered by the CGL policy, the Court emphasized that

---

> a. "Bodily injury" or "property damage" covered by this policy and caused by an "occurrence" which occurs during the policy period . . . .

[7] The definitions of "property damage" and "occurrence" are identical in the primary and excess policies.

the costs of removing and replacing the defective stucco itself amounted to faulty workmanship, which was not covered.[8]  *Id*. at 194, 684 S.E.2d at 544–45.

Two years later, in *Crossmann*, the Court reaffirmed the result in *Newman*—that costs to repair faulty workmanship itself are not covered under a CGL policy but costs to repair resulting damage to otherwise non-defective components are covered—while clarifying that the relevant policy term in the insuring agreement is "property damage," rather than "occurrence."  395 S.C. at 48–50, 717 S.E.2d. at 593–94 (explaining the use of the phrase "physical injury" in defining property damage suggests that such property was "not defective at the outset, but rather was initially proper and injured thereafter").  We clarified that faulty workmanship was

---

[8] On March 10, 2008, this Court issued an initial decision in *Newman* in which we found all damages caused by water intrusion resulting from defectively installed stucco were covered under the terms of the CGL policy.  In so holding, we initially affirmed the trial court's finding that the cost of repairing and replacing the defectively installed stucco itself was included in the covered damages, as the underlying damage could neither be assessed nor repaired without first removing the exterior sheathing.  Thereafter, Auto Owners filed a petition for rehearing on April 21, 2008; on that same day, Harleysville filed a motion with this Court seeking leave to file a brief as Amicus Curiae in support of Auto Owners' petition for rehearing, which was subsequently granted.  In its Amicus brief, citing numerous cases from other jurisdictions in support, Harleysville urged this Court to grant rehearing and argued, among other things, that the Court should reverse its decision finding repair or replacement costs for the faulty workmanship to be covered under the CGL policy, even if the Court ultimately determined other resulting damage was covered.  Auto Owners' petition for rehearing was granted on August 22, 2008, and the case was reheard on November 6, 2008, prior to the underlying Magnolia North and Riverwalk trials.  On September 8, 2009, the Court refiled its decision in *Newman*, this time determining that the cost to remove and replace the defective stucco was not covered under the CGL policy; however, the Court concluded that because there was no evidence in the record indicating which portions of the arbitrator's award of damages may be attributed to the removal and replacement of defective stucco, the entire damages award was covered.  A key point here is that Harleysville's presence in, and corresponding knowledge of, the *Newman* litigation illustrates Harleysville's understanding at the time of the underlying Riverwalk and Magnolia North trials of the distinction between faulty workmanship and resulting property damage and the importance of that distinction for purposes of determining coverage.

not covered because it did not constitute property damage—not because it did not meet the definition of "occurrence." *Id*. (explaining the ongoing water penetration fell within the expanded definition of occurrence—namely, the "continuous or repeated exposure to substantially the same general harmful conditions"—and thus constituted the relevant occurrence). This Court further found the scope of an insurer's duty to indemnify was limited to damages accrued during the insurer's time on the risk, overruling earlier case law that held an insurer's liability was joint and several. *Id*. at 59–64, 717 S.E.2d at 599–01.

In so holding, the Court acknowledged that, when property damage is progressive (as is the case with damages resulting from water intrusion), "it is often 'both scientifically and administratively impossible'" to determine precisely what quantum of property damage occurred during each policy period. *Id*. at 64, 717 S.E.2d at 601 (quoting *Boston Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 301 (Mass. 2009)). Thus, the Court determined that where it is impracticable to calculate the exact measure of damages attributable to the injury that triggered each policy, the default rule is that an insurer's pro rata share of the damages is a function of the total number of years damages progressed and the portion of those years a particular insurer provided coverage. *Id*. at 64–65, 717 S.E.2d at 602.

Although *Crossmann* represented a sea change in terms of adopting the time-on-the-risk approach (and abandoning the "joint and several" approach), *Crossmann* left unchanged the basic concept, first signaled in *L-J* then formally adopted in *Newman*, that the cost of repairing faulty workmanship is not covered under CGL policies but resulting property damage beyond the defective work product itself is covered. With these principles in mind, we turn to the legal issues presented on appeal.

### III.
### Coverage Issues

Harleysville and the POAs each contend the Special Referee made various errors in declaring the scope of coverage under the policies. We disagree and address these claims of error below.

*A. Reservation of Rights to Contest Coverage*

Harleysville first contends the Special Referee erred in finding it failed to properly reserve the right to contest coverage as to the underlying damages that constitute

faulty workmanship, which are not covered under South Carolina law. We disagree. It is axiomatic that an insured must be provided sufficient information to understand the reasons the insurer believes the policy may not provide coverage. We agree with the Special Referee that generic denials of coverage coupled with furnishing the insured with a verbatim recitation of all or most of the policy provisions (through a cut-and-paste method) is not sufficient. That is precisely what happened here, with the exception of the coverage dispute concerning punitive damages.

A basic understanding of reservation of rights to contest coverage may be helpful. "A 'unilateral reservation of rights' is a notice given by the insurer that it will defend [the insured in the lawsuit] but reserves all rights it has based on noncoverage under the policy . . . ." 14 Couch on Ins. § 202:38. A reservation of rights is a way for an insurer to avoid breaching its duty to defend and seek to suspend operation of the doctrines of waiver and estoppel prior to a determination of the insured's liability. *Id.* "Although a reservation of rights may protect an insurer's interests, it also is intended to benefit the policyholder by alerting the policyholder to the potential that coverage may be inapplicable for a loss; that conflicts may exist as between the policyholder and the insurer; and, that the policyholder should take steps necessary to protect its potentially uninsured interests." 12 New Appleman on Insurance § 149.02[2][a].

"A reservation of rights letter must give fair notice to the insured that the insurer intends to assert defenses to coverage or to pursue a declaratory relief action at a later date." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 948 F. Supp. 263, 268 (S.D.N.Y. 1996). Moreover, because an insurer typically has the right to control the litigation and is in the best position to see to it that the damages are allocated, courts have found that where an insurer defends under a reservation of rights, an insurer has a duty to inform the insured of the need for an allocated verdict as to covered versus noncovered damages. *See Tyger River Pine Co. v. Maryland Cas. Co.*, 170 S.C. 286, 170 S.E. 346, 348 (1933) (observing that where an insurer reserves the right to control the defense, the insured is "directly deprived of a voice or part in such negotiations and defense" and noting that if an insurer's interests conflict with those of its insured, the insurer is " bound, under its contract of indemnity, and in good faith, *to sacrifice its interests in favor of those of the* [insured]"); *see also Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co.*, 819 N.W.2d 602, 618 (Minn. 2012) (holding that "when an insurer notifies its insured that it accepts the defense of a[] [] claim under a reservation of rights that includes covered and noncovered claims, the insurer not only has a duty to defend the

claim, but also to disclose to its insured the insured's interest in obtaining a written explanation of the award that identifies the claims or theories of recovery actually proved and the portions of the award attributable to each"); *id.* (reasoning that the "insurer is in a unique position to know the scope of coverage and exclusions in its policies" and "the duty to notify [the insured] is not onerous").

"The right to control the litigation carries with it certain duties," including "the duty not to prejudice the insured's rights by failing to request special interrogatories or a special verdict in order to clarify coverage of damages." *Magnum Foods, Inc. v. Cont'l Cas. Co.*, 36 F.3d 1491, 1498 (10th Cir. 1994) (citations omitted) (explaining "[i]f the burden of apportioning damages between covered and non-covered were to rest on the insured, who is not in control of the defense, the insurer could obtain for itself an escape from responsibility merely by failing to request a special verdict or special interrogatories" (citing *Duke v. Hoch,* 468 F.2d 973, 979 (5th Cir. 1972))). Therefore, by "virtue of its duty to defend, an insurer gains the advantage of exclusive control over the litigation," and "it would be unreasonable to permit the insurer to not disclose potential bases for denying coverage." *Id.* (internal citations and quotation marks omitted).

"If the insured does not know the grounds on which the insurer may contest coverage, the insured is placed at a disadvantage because it loses the opportunity to investigate and prepare a defense on its own." *Desert Ridge Resort LLC v. Occidental Fire & Cas. Co. of N.C.*, 141 F. Supp. 3d 962, 967 (D. Ariz. 2015). Indeed without knowledge of the bases upon which the insurer might dispute coverage, "the insured has no reason to act to protect its rights because it is unaware that a conflict of interest exists between itself and the insurer." *Magnum Foods*, 36 F.3d at 1498 (internal quotation marks and citation omitted). Thus, "[t]he general rule precluding an insurer from raising new grounds contesting coverage in a subsequent action is justified in th[is] []context." *Id.*

Where the insurer fails to adequately reserve the right to contest coverage, the insurer may be precluded from doing so. *See World Harvest Church, Inc. v. GuideOne Mut. Ins. Co.*, 695 S.E.2d 6, 10–11 (Ga. 2010) (finding an insurer could not assert a defense of noncoverage based on its failure to effectively reserve the right to contest coverage). "For a reservation of rights to be effective, the reservation must be unambiguous; if it is ambiguous, the purported reservation of rights must be construed strictly against the insurer and liberally in favor of the insured." *Id.* at 10. (citations and internal quotation marks omitted); *see Desert Ridge Resort*, 141 F. Supp. 3d. 966–68 (explaining that where an insurer

undertakes and exclusively controls the defense of the insured under a reservation of rights, prior to undertaking the defense, the insurer must specify in detail any and all bases upon which it might contest coverage in the future since "[g]rounds not identified in the reservation of rights may not be asserted later by the insurer"); *id.* (explaining the existence of a potential conflict of interest between insured and insurer is what requires the insured to set forth the bases upon which it might contend damages are not covered in a greater amount of detail than would otherwise be required); *Weber v. Biddle*, 483 P.2d 155, 159 (Wash. Ct.App. 1971) (underscoring that when an insurer controls the defense of the action against its insured, "a high fiduciary duty [i]s owed by the insurer to the insured" and observing a "general notice of reservation of rights failing to refer specifically to the policy provision upon which the insurer wished to rely may be insufficient").

At the hearing before the Special Referee, Harleysville produced letters it sent to former Heritage principals and counsel between December 2003 and February 2004.[9] These letters explained that Harleysville would provide a defense in the underlying suits and listed the name and contact information for the defense attorney Harleysville had selected to represent Heritage in each matter. These letters identify the particular insured entity and lawsuit at issue, summarize the allegations in the complaint, and identify the policy numbers and policy periods for policies that potentially provided coverage.[10] Additionally, each of these letters (through a cut-and-paste approach) incorporated a nine- or ten-page excerpt of various policy terms, including the provisions relating to the insuring agreement, Harleysville's duty to defend, and numerous policy exclusions and definitions. Despite these policy references, the letters included no discussion of Harleysville's

---

[9] The Magnolia North lawsuit was filed on May 28, 2003, but it was not until more than six months later that Harleysville sent "reservation of right" letters—one to Heritage Communities, Inc. on December 11, 2003, and another to Heritage Magnolia North, Inc. on December 12, 2003. As none of the parties take issue with this delay, we do not address the timeliness of Harleysville's letters.

[10] Notwithstanding the production of various letters at the hearing, Harleysville conceded it could not find a reservation of rights letter addressed to Buildstar specifically regarding the Magnolia North litigation or any letter regarding the individual homeowners' class action; however, Harleysville's construction-defect litigation manager, Lee Wright, testified that such letters were sent by other Harleysville officials and explained that Harleysville was unable to produce those documents at trial because its copies had been misplaced.

position as to the various provisions or explanation of its reasons for relying thereon. With the exception of the claim for punitive damages, the letters failed to specify the particular grounds upon which Harleysville did, or might thereafter, dispute coverage.

In contrast, concerning punitive damages, Harleysville did provide in detail the basis for the potential denial of coverage:

> The complaint filed against you seeks punitive damages. [Harleysville] reserves the right to disclaim coverage for these since under all of your policies, they would not arise from an "occurrence," do not fit the definition of "bodily injury" or "property damage," and/or were "expected and intended" within the meaning of exclusions in the policies.

These letters further advised Heritage of the possibility it may face an uninsured exposure or interest to the extent that any damages ultimately awarded exceeded the policy limits. Harleysville therefore recommended that Heritage and its principals consider employing personal counsel to represent any uninsured exposure or interest, despite the Heritage entities having long been defunct at the time of the construction-defect trials. Importantly, however, none of the reservation letters advised Heritage of the need for allocation of damages between covered and non-covered losses or referenced a possible conflict of interest or Harleysville's intent to pursue a declaratory judgment action following any adverse jury verdicts in the underlying lawsuits.

The Special Referee thoroughly analyzed these letters to determine whether Harleysville properly reserved its rights. As to the substance of Harleysville's letters to Heritage, the Special Referee found the letters were not sufficiently specific to put Heritage on notice of Harleysville's specific defenses, particularly as to the need for an allocated verdict.

Perhaps in recognition of the inadequacy of the letters, Harleysville additionally relied on an oral reservation of rights based on conversations with representatives of Heritage. The Special Referee considered this argument (and the evidence advanced by Harleysville) and concluded that even if an oral reservation is permitted in South Carolina, the oral reservations Harleysville claimed to have communicated to the principals of the defunct Heritage entities "fall short of the specificity [required] and are ambiguous at best," noting "[p]roviding timely and

specific policy defenses and disclosing actual or potential conflicts are important fiduciary duties of the insurer[,] especially when, as here, Harleysville is controlling the defense of its insured." The Special Referee concluded that Harleysville failed to properly reserve its rights to dispute coverage as to actual damages and, thus, Harleysville was precluded from attempting to do so in this action.

Here, except as to punitive damages, Harleysville's reservation letters gave no express reservation or other indication that it disputed coverage for any specific portion or type of damages. Nor did the letters or testimony indicate that, in the event Heritage was found liable in the construction-defect suits, Harleysville intended to file the instant lawsuit to contest various coverage issues. Specifically, Harleysville did not expressly put its insureds on notice that it intended to litigate the issues of whether any damages resulted from acts meeting the definition of occurrence, whether any damages occurred during the applicable policy periods, what damages were attributable to non-covered faulty workmanship, and whether certain damages resulted from intentional acts by the insured and were thus excluded. And in no way did the letters inform the insureds that a conflict of interest may have existed or that they should protect their interests by requesting an appropriate verdict. As the Fifth Circuit found in *Duke v. Hoch*, Harleysville's reservation "was no more than a general warning" and "too imprecise to shield [the insurer]." 468 F.2d 973, 979 (5th Cir. 1972). We find there is evidence in the record to support the Special Referee's finding that Harleysville's reservation letters were insufficient to reserve its right to contest coverage of actual damages,[11] and

---

[11] Moreover, even were we to conclude there was no evidence to sustain this finding, the ultimate disposition of the coverage question would nevertheless remain unchanged. In addition to finding Harleysville's attempted reservation of rights to be insufficient, the Special Referee also found "the Court has no basis upon which to make a logical assessment of the jury's purpose when it awarded the general verdict" as to the negligent construction, breach of warranty, and breach of fiduciary duty claims, and the Special Referee refused to "engage in unguided speculation with respect to this issue of [allocating losses], particularly when the dilemma now confronting Harleysville is of its own making." Indeed, Harleysville cannot overcome the law in South Carolina concerning general verdicts. *See Owners Ins. Co. v. Clayton*, 364 S.C. 555, 561–62, 614 S.E.2d 611, 614–15 (2005) (affirming trial court's holding in a declaratory judgment action that insurer had a duty under the CGL policy to indemnify insured for the entire general verdict where at least one of several claims was covered and explaining that when a jury

therefore, we affirm.[12]  Because we find Harleysville did not effectively reserve the

returns a general verdict, a finding of coverage as to any of the claims submitted to that jury "answers the coverage question" as to the entire general verdict); *see also Newman*, 385 S.C. at 198, 684 S.E.2d at 547 (finding that even though arbitrator's award improperly included amounts for replacing and repairing faulty workmanship itself, there was insufficient evidence in the record to allow the Court to determine which costs were solely attributable to the non-covered faulty workmanship and finding that the insurer's duty to indemnify therefore covered the entire award).  The dissent ignores the Special Referee's finding in this regard, which serves as an alternative and independent basis upon which we affirm.

[12] The dissent also suggests that the timing of this Court's decision in *Newman* somehow precludes Harleysville from having set forth in its reservation of rights letters the faulty workmanship versus covered damages distinction upon which it now seeks to parse the general jury verdict.  As noted, any claim that Harleysville was not aware of this very distinction borders on frivolity because Harleysville appeared in other earlier cases (e.g., *Newman*) for the express purpose of urging the very distinction it now asserts.  Moreover, as early as December 2004, Harleysville had formally taken the position that faulty workmanship was not covered in a dispute with a different insured in a South Carolina federal court.  Specifically, Harleysville filed a complaint seeking a declaration that it had no duty to defend its insured, a Beaufort County homebuilder and general contractor, in thirteen state-court actions, and arguing the damages at issue in those lawsuits arose from the insured's faulty workmanship and, thus, were not covered under the CGL policy.  *Harleysville Mut. Ins. Co. v. Cambridge Bldg. Corp.*, 66 Fed. R. Serv.3d 811 (D.S.C. 2006) (quoting Harleysville's description of the coverage questions presented as "'whether the claims arise from an "occurrence"; whether they constitute "property damage"; and whether the claims allege only damage to property arising from a defect, deficiency, inadequacy or dangerous condition in [the insured's] work'").  Moreover, Harleysville further asserted that "'the law of South Carolina is settled: there is no insurance coverage for construction defects.'" *Id*. (quoting Harleysville's pleadings).  Thus, regardless of any decisions by this Court in the interim, the position taken by Harleysville—that faulty workmanship is not covered under the insuring agreement— has been consistent since 2004, and Harleysville demonstrated that it understood how to articulate its position in detail; it simply failed to do so in the cases presently before the Court.  Moreover, the relevant language in Harleysville's policies has, at all times, remained unchanged, as has South Carolina's common law regarding conflicts of interest and the high

right to contest coverage, we need not address Harleysville's claims of error regarding various policy exclusions. We turn now to the issue of punitive damages, the coverage of which Harleysville effectively reserved the right to contest.

*B. Punitive Damages—Insuring Agreement*

Harleysville argues it has no duty to indemnify Heritage for punitive damages, which it contends are not covered under the insuring agreement in the first instance. Specifically, Harleysville contends that by awarding punitive damages, the jury necessarily found that Heritage's wrongdoing and the results therefrom were not accidental, which is required for losses to amount to an occurrence. We disagree.

The insuring language in the CGL policies provides Harleysville will indemnify Heritage for "those sums" Heritage becomes legally obligated to pay as damages arising from an occurrence. The policies include the standard CGL definition of an "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."

In arguing punitive damages are not "accidental" and therefore not an occurrence, Harleysville ignores that the progressive water intrusion constitutes the relevant occurrence. Further, Harleysville disregards not only the progressive-damage aspect of the occurrence definition (i.e., "continuous or repeated exposure to substantially the same general harmful conditions") but also this Court's holding in *Crossmann* that the insuring language of a CGL policy is triggered by progressive damages caused by repeated water intrusion. *Crossmann*, 395 S.C. at 47, 717 S.E.2d at 593. Thus, Harleysville is contractually obligated to indemnify Heritage for those sums Heritage becomes legally obligated to pay as a result of that progressive water intrusion, and the policy does not limit "those sums" to compensatory or actual damages.

Properly looking to the terms of the applicable policies, the Special Referee found that if Harleysville intended to preclude coverage for punitive damages, it could

standards of conduct an insurer owes to its insureds. *See Sims v. Nationwide Mut. Ins. Co.*, 247 S.C. 82, 145 S.E.2d 523 (1965); *Tyger River Pine Co. v. Maryland Cas. Co.*, 170 S.C. 286, 170 S.E. 346 (1933). Thus, the suggestion in the dissent that Harleysville is being held to a standard of clairvoyance must be rejected.

simply have added the word "compensatory" before the word "damages" in the policies' insuring language.  Because the policies' language did not unambiguously exclude punitive damages, the Special Referee applied well-established law and construed the policy language in favor of the insured, finding Harleysville was required to indemnify Heritage for punitive damages.

"[A]mbiguities in an insurance contract must be construed in favor of the insured." *Whitlock v. Stewart Title Guar. Co.*, 399 S.C. 610, 615–16, 732 S.E.2d 626, 628 (2012).  Moreover, this Court has previously found punitive damages are covered as they constituted a sum the insured was "legally obligated to pay as damages." *Carroway v. Johnson*, 245 S.C. 200, 204, 139 S.E.2d 908, 910 (1965); *see S.C. State Budget & Control Bd. v. Prince*, 304 S.C. 241, 249, 403 S.E.2d 643, 648 (1991) ("Here, as in *Carroway,* the policy does not limit recovery to actual damages.  Instead, the policy uses broader language which, under the rules of construction and interpretation of insurance policies, must be read as encompassing punitive damages.").  Because the policy does not unambiguously exclude punitive damages, we construe the policy language in favor of the insured to include punitive damages, and we therefore affirm the Special Referee's finding that punitive damages are covered.  *See, e.g.*, *Crossmann*, 395 S.C. at 47, 717 S.E.2d  at 593–94 (noting that an ambiguity in a CGL policy must be construed in favor of the insured).

## C. Punitive Damages—"Expected or Intended" Exclusion

Harleysville next argues the Special Referee erred in failing to find punitive damages fall within the policy exclusion barring coverage for acts that are "expected or intended."  Harleysville contends that by awarding punitive damages, the jury *necessarily* found that Heritage's wrongdoing was a "conscious failure" and involved a "present consciousness of wrongdoing," and thus, Heritage's wrongdoing and the results thereof were intended or at least expected damages, which would be excluded under the policy.[13]  We disagree.

An insurance company bears the burden of establishing the applicability of policy exclusions.  *Owners Ins. Co. v. Clayton*, 364 S.C. 555, 560, 614 S.E.2d 611, 614 (2005) (citing *Boggs v. Aetna Cas. & Sur. Co.,* 272 S.C. 460, 252 S.E.2d 565

---

[13] On each jury verdict form, the jury answered "Yes" to the question, "Does the Jury find by clear and convincing evidence that the Defendants' actions were willful, wanton, reckless, and/or grossly negligent?"

(1979)).  For an act to be excluded from coverage under the policy exclusion for losses "expected or intended from the standpoint of the insured," this Court has held that "not only the act causing the loss must have been intentional but [] the results of the act must also have been intended."  *Miller v. Fidelity-Phoenix Ins. Co.*, 268 S.C. 72, 75, 231 S.E.2d 701, 702 (1977) (explaining the insured must be shown to have acted intentionally and to have intended the specific type of loss or injury that resulted for the exclusion to apply).  These questions of the insured's intent are factual in nature.  *Id.*  "In an action at law tried without a jury, the appellate court will not disturb the trial court's findings of fact unless there is no evidence to reasonably support them."  *Newman*, 385 S.C. at 191, 684 S.E.2d at 543 (citing *Hamin,* 368 S.C at 540, 629 S.E.2d at 685).

The Special Referee found Heritage intended to construct quality condominiums and that Harleysville failed to meet its burden of proving Heritage expected or intended its subcontractors to perform negligently or expected or intended the property damage that resulted from the negligent construction.  In so finding, the Special Referee relied upon evidence that Heritage expected its subcontractors to be reliable and skilled, that Heritage was actively addressing construction and water-intrusion concerns to determine the source of the problems, and that post-construction testing revealed a portion of the water intrusion was the result of defectively manufactured components rather than improper installation.  In this regard, the Special Referee relied upon *Pennsylvania Thresherman & Farmer's Mutual Casualty Insurance Co. v. Thornton*, 244 F.2d 823 (4th Cir. 1957), a Fourth Circuit decision applying South Carolina law, in finding that an insured's negligent conduct may be so gross as to form a basis for punitive damages yet not rise to the level of an intentional act such that it would come within the ambit of the expected-or-intended policy exclusion.  Ultimately, the Special Referee concluded there was nothing in the record demonstrating Heritage intended to injure the POAs or homeowners and, thus, punitive damages were not excluded from coverage.

Although Harleysville produced some testimony suggesting Heritage was aware of certain instances of post-construction water intrusion around various windows, there is other evidence that suggests Heritage was attempting to find the source of the leaks and stop them.  We recognize the counter-argument propounded by Harleysville that Heritage approached the construction of these condominium projects with the aim of doing as little as possible.  The evidence of shoddy workmanship would tend to support the argument that Heritage had knowledge that the projects were substandard.  But our standard of review as to this factual

issue of intent is not de novo.  Because there is evidence in the record to support the Special Referee's findings, we are constrained by the standard of review to affirm the finding that Harleysville failed to meet its burden of showing the expected-or-intended policy exclusion operates to exclude punitive damages from coverage.  *See S.C. Dep't of Natural Res. v. Town of McClellanville*, 345 S.C. 617, 623, 550 S.E.2d 299, 303 (2001) (observing that the determination of a party's intent is a question of fact); *State v. Tuckness*, 257 S.C. 295, 299, 185 S.E.2d 607, 608 (1971) (explaining that the issue of intent is a question for the factfinder); *see also Miller*, 268 S.C. at 75, 231 S.E.2d at 702 (noting that an insurer must demonstrate not only that the insured acted intentionally but also that the insured intended the specific type of loss or injury that resulted for the damages to be excluded from coverage as "expected or intended" losses); *Townes Assocs. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 776 (1976) (explaining that in an action at law tried without a jury, an appellate court reviews the evidence, "not to determine the preponderance thereof but to determine whether there is any evidence which reasonably supports the factual findings of the judge").

## IV.
### Allocation Issues: Time on the Risk

Both Harleysville and the POAs contend the Special Referee made various errors in allocating damages based on the time-on-the-risk formula set forth in *Crossmann*.  For the reasons below, we affirm the Special Referee's time-on-the-risk computation as to Magnolia North and affirm as slightly modified as to the loss-of-use damages in the Riverwalk litigation.

In December 2011, the Special Referee reopened the evidentiary hearing to allow the parties to present arguments and evidence regarding the application of *Crossmann*'s time-on-the-risk formula.  During the hearing, the parties presented evidence that following construction, the last certificate of occupancy was issued in January 2000 at Riverwalk and August 2000 at Magnolia North.  The evidence also revealed that Heritage maintained insurance coverage through June 2001 at Riverwalk and November 2000 at Magnolia North.

Additionally, the POAs offered the testimony of Drew Brown, an expert in building diagnostics and general contracting, who testified that the water intrusion damage at the Riverwalk and Magnolia North developments began at the time of the first rain event following improper installation of the building components.  In terms of the progressive nature of the damages, Brown further explained:

> [D]amage and decay are two different things. Damage begins with the water entering the sensitive, the moisture[-]sensitive building products, and that's the standard of the [building] code. The [building] code indicates that we must protect these building components from damage, from water intrusion, which then will— that water intrusion begins, the wood products begin to uptake that water, that damage cycle has begun. Eventually, decay will begin, which is a microbial process that will, will actually begin to destroy the ability of the wood to carry any load . . . .

Brown testified that by the time he conducted site visits between December 2003 and April 2004, many of the building components at the developments were damaged to the point they required replacement and that subsequent decay eventually caused structural failure and collapse at both developments.[14]

In conducting the time-on-the-risk analysis, the Special Referee, mindful of the general jury verdicts, specifically declined to conduct a per-building calculation because the jury verdicts were not rendered on a per-building basis. The Special Referee concluded that the most equitable way to proceed in these specific cases would be to compare the total number of days in the damage period to the total number of days of coverage under the Harleysville policies.

In determining the proper progressive-damages period, the Special Referee found the damages began thirty days after the first certificate of occupancy was issued at each development. As to the progressive-damages period end date, the Special

---

[14] At the hearing, Harleysville proffered the testimony of a general-contracting construction expert, who conducted site visits to survey the construction deficiencies and prepared a report to estimate the percentage of damage attributable to faulty workmanship at each development. Although this evidence was ultimately excluded because the site visits and subsequent reports long post-dated the jury verdicts and did not correspond with the evidence of damages presented to the juries, we emphasize that even Harleysville's own expert testified it was impossible to determine when the damage began or ended at either development. Thus, even had the Special Referee admitted this evidence, it nevertheless would not support the point Harleysville now urges—namely, that the progression of damages was reasonably ascertainable.

Referee used the date of Brown's last site visit prior to the underlying trials as the damages cut-off point, reasoning that by that date, the building components identified in Brown's report were sufficiently damaged to require replacement, notwithstanding any further progression and decay. Using those dates, the Special Referee determined that damages progressed for a period of 2,347 days at Riverwalk and 1,943 days at Magnolia North. The Special Referee further determined that Harleysville provided coverage for 1,300 days in the Riverwalk matter and 691 days in the Magnolia North matter. The Special Referee used those figures to calculate a time-on-the-risk multiplier for each development, which he then applied to calculate Harleysville's pro rata portion of the progressive damages.

On appeal, both parties take issue with the dates the Special Referee used in his calculations, and Harleysville contends the Special Referee erred in failing to conduct a per-building analysis and in refusing to include loss-of-use and punitive damages in the figure to be reduced by the time-on-the-risk multiplier. Additionally, the POAs contend application of the time-on-the-risk formula at all is inappropriate because the jury rendered general verdicts, and therefore Harleysville should be required to indemnify Heritage for the entire amount of all jury verdicts—not a reduced amount proportionate to Harleysville's time on the risk.

*A. Loss of Use—Actual Damages*

Harleysville contends the actual damages awarded for loss of use in the Riverwalk class action should be deemed to be progressive in nature and, thus, included in the amount subject to allocation based on Harleysville's time on the risk. We agree and modify the Special Referee's Riverwalk calculation slightly to include allocation of the actual damages resulting from loss of use.

"An insurance policy is a contract . . . and the terms of the policy are to be construed according to contract law." *Auto Owners Ins. Co. v. Rollison*, 378 S.C. 600, 606, 663 S.E.2d 484, 487 (2008) (citing *Estate of Revis v. Revis,* 326 S.C. 470, 477, 484 S.E.2d 112, 116 (Ct. App. 1997)). "Where [a] contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009) (citing *Schulmeyer v. State Farm Fire and Cas. Co.,* 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003)). "It is a question of law for the court whether the language of a contract is ambiguous." *Id*. (citing *Town of McClellanville,* 345 S.C. at 623, 550 S.E.2d at 302–03).

The policies provide "'[p]roperty damage' that is loss of use of tangible property that is not physically injured will be deemed to occur at the time of the 'occurrence' that caused it."[15]  In this case, the relevant occurrence is the repeated infiltration of water into the improperly constructed buildings, which is a progressive injury.  *See Crossmann*, 395 S.C. at 52 n.8, 717 S.E.2d at 595 n.8 (explaining a progressive injury "results from an event or set of conditions that occurs repeatedly or continuously over time, such as . . . the continual intrusion of water into a building").  Because the underlying occurrence is progressive in nature, we find the language of the policies unambiguously provides that loss-of-use damages must be deemed to have progressed over the same period of time.  Accordingly, we modify the Special Referee's time-on-the risk calculation for Riverwalk as follows:

| Riverwalk | |
|---|---:|
| Actual damages—POA | $4,250,000 |
| Actual damages—Class Action | $250,000 |
| Setoff[16] | ($1,028,821) |
| Adjusted actual damages | $3,471,179 |
| Time-on-the-risk multiplier | 0.5538 |
| Harleysville's pro rata share of actual damages | $1,922,338 |
| Punitive damages—POA | $250,000 |
| Punitive damages—Class Action | $750,000 |
| Total amount covered by Harleysville's policies | $2,922,338 |

In sum, we affirm the findings of the Special Referee as modified above, and find the policies covered $2,922,338 as to the Riverwalk litigation.

*B. Punitive Damages*

Turning to the issue of punitive damages, Harleysville argues that punitive damages, like actual damages, are subject to allocation based on time on the risk.

---

[15] The excess liability policies contain a similar provision: "All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

[16] By way of post-trial motion in the underlying construction-defect suit, Harleysville was granted a setoff as a result of settlement amounts paid by defendants other than Heritage.

Without establishing a categorical rule, we disagree with Harleysville in these circumstances and affirm.

In the construction-defect trials, the POAs presented evidence that during the construction process at both Riverwalk and Magnolia North (as well as several of Heritage's other large-scale condominium developments in Horry County), Heritage chose not to employ an inspecting architect to evaluate and approve or disapprove any modifications and substitutions to the original construction plans and specifications. The POAs contended the absence of an inspecting architect resulted in the widespread and unchecked substitution of inferior building products and improper structural modifications that ultimately led to the pervasive structural and water-intrusion problems, all of which could have been avoided had the original specifications been followed or properly modified. Further, the POAs argued that although Heritage was aware of significant water-intrusion problems at the other developments before beginning construction at Riverwalk and Magnolia North, Heritage nevertheless continued the same inadequate construction practices at these developments. The POAs presented additional evidence that despite knowledge of the ongoing construction problems, Heritage also deliberately targeted its sales efforts toward elderly, out-of-state residents and marketed its condominiums on the basis of quality and luxurious amenities, such as swimming pools and tennis courts, that were never constructed. The POAs contended that all of this evidence demonstrated Heritage willfully and repeatedly sold improperly constructed condominiums to innocent purchasers and that such conduct justified the imposition of punitive damages. As noted, the jury verdicts included punitive-damage awards of $2,000,000 in the Magnolia North suit, $250,000 in the Riverwalk POA suit, and $750,000 in the Riverwalk class action.

Although the Special Referee determined the time-on-the-risk principles set forth in *Crossmann* were applicable to the actual damages awarded by the juries, the Special Referee rejected Harleysville's argument that punitive damages were likewise subject to time-on-the-risk allocation, observing that the formula set forth in *Crossmann* referred only to damages that were deemed to be progressive.

On appeal, Harleysville argues that punitive damages are necessarily predicated upon the underlying progressive damages and, therefore, are also subject to time-on-the-risk allocation. Harleysville further avers that, like actual damages, punitive damages also serve a compensatory role, and since the pattern of reprehensible conduct justifying the imposition of punitive damages took place

over a period of several years, "basic principles of fairness" require that Harleysville not be saddled with the entire punitive damages award.

Initially, we find Harleysville seeks to blur the distinction between actual and punitive damages and conflates the underlying purposes of these two different types of damages. "The purpose of *actual or compensatory damages* is to compensate a party for injuries suffered or losses sustained." *Clark v. Cantrell*, 339 S.C. 369, 378, 529 S.E.2d 528, 533 (2000) (emphasis added) (examining the fundamental differences between actual damages and punitive damages and rejecting the argument that punitive damages should be reduced by the proportion of the plaintiff's comparative negligence). "The goal [of compensatory damages] is to restore the injured party, as nearly as possible through the payment of money, to the same position he or she was in before the wrongful injury occurred." *Id.* (citations omitted).

In contrast, punitive damages relate not to the plaintiff, but rather to the "the *defendant's* reckless, willful, wanton, or malicious conduct." *Id.* at 379, 529 S.E.2d at 533 (emphasis added); *see also Mitchell v. Fortis Ins. Co.*, 385 S.C. 570, 584, 686 S.E.2d 176, 183 (2009) (observing that an award of punitive damages "'further[s] a state's legitimate interests in punishing *unlawful conduct* and deterring its repetition'" (emphasis added) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996))); *Genay v. Norris*, 1 S.C.L. (1 Bay) 6, 7 (1784) (focusing on the conduct of the defendant in affirming an award of "very exemplary damages" and finding such damages were warranted where the defendant's conduct was found to be "very wanton," particularly in light of the defendant's special training and experience). "Although compensatory damages and punitive damages are typically awarded at the same time by the same decisionmaker, they serve distinct purposes." *Cooper Indus., Inc. v. Leatherman Tool Grp.*, 532 U.S. 424, 432 (2001). "The former are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Id.* (citations omitted). "The latter . . . operate as 'private fines' intended to punish the defendant and to deter future wrongdoing." *Id.*

Although this Court has acknowledged punitive damages may also "compensate . . . for the willfulness with which the [plaintiff's] right was invaded," this Court has unequivocally rejected the attempt to "blur all distinctions between actual and punitive damages by unduly emphasizing [any] compensatory aspect." *Clark*, 339 S.C. at 379, 529 S.E.2d at 533 (citations and internal quotation marks omitted). Indeed, "'[i]t is a well-established principle of the common law, that . . . a jury may inflict what are called exemplary, punitive, or vindictive damages upon a

defendant, having in view *the enormity of his offence rather than the measure of compensation* to the plaintiff.'" *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 15–16 (1991) (emphasis added) (quoting *Day v. Woodworth,* 54 U.S. 363, 371 (1852)); *see also id.* at 54 (O'Connor, J., dissenting) ("Unlike compensatory damages, which serve to allocate an existing loss between two parties, punitive damages are specifically designed to exact punishment in excess of actual harm to make clear that the defendant's misconduct was especially reprehensible."). We therefore reject Harleysville's attempt to mischaracterize the punitive damages in these cases as compensatory.

We turn now to the question of whether punitive damages, though not compensatory in nature, are nevertheless subject to time-on-the-risk allocation. The concept of time on the risk is a judicially created, equitable method of allocating progressive damages "where it is impossible to know the exact measure of damages attributable to the injury that triggered each policy," as is the case here. *Crossmann*, 395 S.C. at 64, 717 S.E.2d at 602; *see id*. at 64–67, 717 S.E.2d at 601–03 (explaining that the time-on-the-risk method is the "equitable approach [that] best harmonizes" the language of CGL policies with the scientific and administrative impossibility of identifying the precise quantum of property damage occurring during each policy period). Ultimately, this method of allocation "addresses a problem of proof" in cases involving progressive property damages "where it is not feasible to make a fact-based allocation of losses attributable to each policy period." *Boston Gas Co*., 910 N.E.2d at 316. At the heart of the time-on-the-risk theory is the idea that the policy period is a temporal limitation upon an insurer's indemnity obligation. *See Crossmann*, 395 S.C. at 60, 717 S.E.2d at 599 (rejecting the "joint and several" allocation approach because, *inter alia*, that approach ignores "critical language" limiting the insurer's indemnity obligation to those losses occurring during the policy period). As we explained in *Crossmann*, the time-on-the-risk allocation is a determination of "how much coverage [is to] be provided by each triggered policy." *Id*. at 59, 717 S.E.2d at 599. In other words, the analysis begins with a determination of when coverage-triggering losses occurred, then allocates losses based on the period of time each insurer was on the risk.

A key point to the time-on-the-risk analysis is that this allocation method was developed as a means of apportioning actual, compensatory damages where the injury progressed over time. S*ee Crossmann*, 395 S.C. at 45, 717 S.E.2d at 591 ("Where proof of the *actual property damage* distribution is not available, the allocation formula adopted herein will serve as an appropriate default method for dividing the loss . . . ." (emphasis added)). As such, the logic and policy

considerations underlying the time-on-the-risk method may not as easily lend themselves to the application of this concept to punitive damages. Nevertheless, the parties have presented this Court (and the Special Referee) with a paucity of legal authority to inform our decision as to the allocability of punitive damages, thus forcing us to resort to these policy considerations as our guide in navigating this novel issue. We emphasize it is not our intent to create a bright-line rule that punitive damages may never be subject to allocation based on time on the risk. However, we conclude the punitive-damage awards are not subject to reduction under the facts of these cases.

Specifically, the difficulty here is that Harleysville does not contend, and has presented no evidence, that any of the reprehensible acts upon which punitive damages are predicated occurred outside the relevant policy periods. To the contrary, the evidence in the record demonstrates that all of Heritage's reprehensible acts that justified the juries' imposition of punitive damages took place entirely during the period of time Harleysville's policies were effective. Thus, we conclude the Special Referee did not err in finding punitive damages were not subject to reduction based on the time-on-the-risk multiplier in these cases.

## C. Time-on-the-Risk Allocation of the General Verdict

We next turn to the POAs' contention that it was error to apply the time-on-the-risk allocation to the general verdicts based on the possibility that some portion of the jury awards might include losses which are attributable to non-progressive damages stemming from the POAs' breach of fiduciary duty or breach of warranty claims. We affirm.

In rejecting this argument, the Special Referee determined that both covered and non-covered (faulty workmanship) claims were submitted to the jury and concluded that it would be too speculative and inappropriate to allocate the jury verdicts between progressive damages subject to time-on-the-risk allocation and fixed losses not subject to time-on-the-risk allocation. Thus, the Special Referee concluded the entire amount of actual damages would be reduced in proportion to Harleysville's time on the risk.

Essentially, the POAs attempt to use the general verdict rule as both a shield and a sword, arguing first that the general verdict rule shields any evaluation of covered versus non-covered damages, yet thereafter arguing application of time-on-the-risk principles is wholly precluded by the possibility that some portion of the jury

verdicts might be attributable to non-progressive damages.  We find the Special Referee properly rejected this argument; the general verdict rule may not serve as a basis for the POAs to obtain coverage for non-covered claims and simultaneously serve as a basis to avoid time-on-the-risk apportionment of any aspect of the jury verdicts.  *See Mitchell v. Fed. Intermediate Credit Bank*, 165 S.C. 457, 164 S.E. 136, 140 (1932) (noting a party may not use the same argument as both a shield and a sword) (citations omitted).

## *D. Factual Determinations*

Lastly, we do not believe the Special Referee abused his discretion in refusing to conduct a per-building analysis or in setting the policy period or progressive-damages period dates, as there is evidence in the record to support those findings. *See Crossmann*, 395 S.C. at 65–66, 717 S.E.2d at 602 (finding it is within the sound discretion of the trial court to determine, in light of the particular facts and circumstances of each case, the most appropriate manner for applying the basic time-on-the-risk formula to reasonably approximate each insurer's time on the risk); *Newman*, 385 S.C. at 191, 684 S.E.2d at 543 ("In an action at law tried without a jury, the appellate court will not disturb the trial court's findings of fact unless there is no evidence to reasonably support them."); *BB & T v. Taylor*, 369 S.C. 548, 551, 633 S.E.2d 501, 502–03 (2006) (explaining that when a determination lies within the sound discretion of the trial court, the standard of review on appeal is limited to determining whether there was an abuse of discretion); *see also Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 670 N.E.2d 740, 756–57 (Ill. Ct. App. 1996) (refusing to disturb the trial court's exercise of discretion in apportioning progressive damages).

Based on the foregoing, we affirm the Special Referee's time-on-the-risk calculation as to Magnolia North and affirm as slightly modified as to Riverwalk.

## V.
## Miscellaneous Trial Issues

Harleysville argues the Special Referee erred in excluding certain evidence and in making various factual findings.  After a full review of the record, we find the Special Referee did not abuse his discretion and affirm pursuant to Rule 220, SCACR.  *See Am. Fed. Bank, FSB v. No. One Main Joint Venture*, 321 S.C. 169, 174–75, 467 S.E.2d 439, 442 (1996) ("Conduct of a trial, including admission and rejection of testimony, is largely within the trial judge's sound discretion, the

exercise of which will not be disturbed on appeal unless appellant can show abuse of such discretion, commission of legal error in its exercise, and resulting prejudice to appellant's rights." (citing *Fetner v. Aetna Life Ins. Co.,* 199 S.C. 79, 18 S.E.2d 521 (1942))).

Additionally, Harleysville contends it was error for the Special Referee not to construe its motion for judgment as a matter of law as being made pursuant to Rule 41(b), SCRCP. Rule 41(b), SCRCP, provides that, in a non-jury action, after the plaintiff "has completed the presentation of his evidence, *the defendant . . .* may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." (emphasis added). Here, Harleysville was the plaintiff—not the defendant. Moreover, Harleysville in no way sought a ruling that it, as "the plaintiff[,] has shown no right to relief." Indeed, Harleysville's motion sought a ruling to the contrary, namely that Harleysville was entitled to relief as a matter of law. Thus, we find the argument that the Special Referee erred in failing to construe Harleysville's motion as one made pursuant to Rule 41(b), SCRCP, is without merit. *Cf. Waterpointe I Prop. Owner's Ass'n v. Paragon, Inc.*, 342 S.C. 454, 458, 536 S.E.2d 878, 880 (Ct. App. 2000) (construing *defendant's* "directed verdict" motion in a non-jury action as a motion for involuntary non-suit under Rule 41(b), SCRCP, and reviewing it as such). In any event, there can be no prejudicial error here, for it is manifest the Special Referee rejected most of Harleysville's arguments and had no intention of summarily ruling in favor of Harleysville.

## VI.

In sum, we find the Special Referee correctly found Harleysville failed to reserve the right to contest coverage of actual damages and that punitive damages are covered under the CGL policies. We also find there is evidence in the record to support the Special Referee's factual findings as to the progressive damages periods and that the Special Referee did not abuse its discretion in determining Harleysville's time on the risk at Magnolia North. We find loss-of-use actual damages at Riverwalk are subject to time-on-the-risk allocation but that punitive damages at both developments are not. We thus affirm in the Magnolia North matter and affirm as modified in the Riverwalk matter.

**AFFIRMED AND AFFIRMED AS MODIFIED.**

**BEATTY, C.J., HEARN, JJ., and Acting Justice James E. Moore, concur. Acting Justice Costa M. Pleicones dissenting in a separate opinion.**

**ACTING JUSTICE PLEICONES:** I respectfully dissent and would reverse and remand to the special referee with instructions.

In my view, the critical dates necessary to the determination of the merits here are these:

> May 2003: Magnolia North POA sues Heritage
>
> December 2003: Riverwalk POA sues Heritage
>
> December 2003 - January 2004: Harleysville informs Heritage it will defend under a reservation of rights
>
> November 10, 2005: *L-J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 366 S.C. 117, 621 S.E.2d 33 (2005) becomes final. Holds that faulty workmanship that damages only the work itself is not an "occurrence" within the meaning of a CGL policy.
>
> January 2009: Riverwalk verdict
>
> May 2009: Magnolia North verdict
>
> October 29, 2009: *Auto Owners Ins. Co. v. Newman*, 385 S.C. 187, 684 S.E.2d 541 (2009) becomes final. Holds that progressive damage to other materials as the result of subcontractor's faulty workmanship is "property damage" and therefore a covered occurrence under CGL policy, and interprets two policy exclusions.

## A. Reservation of Rights

The majority finds Harleysville's notices of its reservation of rights insufficient because they (1) failed to notify the insureds of the particular grounds upon which it might dispute coverage; (2) did not advise of the need to allocate damages between covered and non-covered losses; and (3) did not inform the insureds that Harleysville would seek a declaratory judgment if there were adverse jury verdicts. I note four things at the outset: (1) the majority cites no South Carolina authority that requires this type of information be included in a reservation of rights letter; (2) these letters were sent almost two years before *L-J* became final in November 2005, and more than eight months before the initial *L-J* opinion was filed in August 2004, at a time when 'occurrence' and 'property damage' definitions were

unsettled; (3) the letters were sent more than five and a half years before *Newman* held that 'progressive' damages to other materials were property damage, and interpreted two standard CGL policy exclusions; and (4) the reservation of rights letters were sent by Harleysville to its sophisticated insured, Heritage Builders, and not to the POAs who now purport to contest the sufficiency of these notices.

I disagree with the majority and find the reservation of rights letters to be adequate. In support of my conclusion, I quote from a letter sent by Harleysville ("HMIC") on January 23, 2004:

RESERVATION OF RIGHTS

This letter is not intended to waive any of HMIC's rights under any HMIC insurance policy or at law. HMIC continues to reserve it [sic] rights as set forth in its prior reservation of rights, and as set forth herein, including but not limited to the following issues:

1) Whether property damage or bodily injury was caused by an occurrence as defined by any policy or policies and happened during an HMIC policy period;

2) Whether notice was provided to HMIC in compliance with the notice provision of the policy or policies;

3) Whether the cooperation clause of any policy or policies has been complied with;

4) Whether the applicable limits of any and all applicable primary or excess policies of insurance have, in fact, been exhausted;

5) Whether or not any exclusion applies to preclude coverage under any policy or policies; and

6) Any additional coverage defenses which may arise during the investigation of this matter.

The pleadings seek punitive damages. HMIC reserves the right to disclaim coverage for these since under all of your policies, they would not arise from an "occurrence," do not fit the definition of "bodily injury" or "property damage," and/or were

"expected and intended" within the meaning of exclusions in the policies.

If there is available to you coverage from any other insurance carrier or source in addition to that provided by HMIC, you should immediately notify the carrier or source of all the facts and circumstances surrounding this matter, and that you have been named as a defendant in this lawsuit. Please notify HMIC of the name and address of any such other insurance carrier, and of the policy number under which this additional coverage is available to you.

Nothing contained in this letter should be deemed a waiver of the terms and conditions of the HMIC policy. HMIC expressly reserves the right to rely upon any term or condition of the insurance contract or any other ground which may be found to limit or preclude coverage.

In the event that it is determined that there is no coverage for this action under the HMIC policy, HMIC expressly reserves the right to recover the amounts incurred in the defense of this action from you or any of your other insurers that may be liable for these costs.

Please advise us of any information that you have that you believe may affect our determination concerning the coverage available under the HMIC policy.

HMIC's position is based upon the facts which have been made available to it to date. HMIC expressly reserves the right to modify its determination concerning the potential for coverage under this policy if the information developed during our investigation of this claim warrants the modification.

In my opinion, the majority's conclusion - that this language was insufficient to put the builder on notice, and its suggestion that an insurance company must explain its position or its reasons in order to reserve its rights, or must specify which types of damages it might dispute - is unwarranted, especially when one considers these letters and conversations took place between sophisticated commercial entities long before *L-J* had settled (for a time) the meaning of the

terms "occurrence," and much longer before the Court had interpreted the meaning of certain policy exclusions. *See*, *e.g.*, *Newman*, *supra*.

I would reverse the Special Referee's finding that Harleysville did not effectively reserve its rights. To the extent the majority relies upon *Newman* to suggest Harleysville is "at fault in not seeking an allocation of covered damages," I point out the verdicts in Riverwalk (January 2009) and in Magnolia North (May 2009) predate *Newman* (October 2009) by at more than five months. Moreover, there is no suggestion how Harleysville could have intervened in these lawsuits and asserted a defense against coverage without creating an impermissible conflict of interest in violation of established South Carolina law. *See Sims v. Nationwide Mut. Ins. Co.*, 247 S.C. 82, 145 S.E.2d 523 (1965). In my view, nothing in the general verdicts bars Harleysville from now litigating its liability under its reservation of rights letters.

For the reasons given above, I would allow Harleysville to litigate its liability, including any liability for the punitive damages award, in these declaratory judgment actions. I would also reverse and remand the allocation of damages as any "time on risk" analysis is necessarily affected by the proper allocation of damages, and a determination of their "progression."

I respectfully dissent.