# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Peter D. Protopapas, as Receiver for Starr Davis Company, Inc. and Starr Davis Company of S.C., Inc., Respondents,

v.

Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company; The Standard Fire Insurance Company; St. Paul Fire and Marine Insurance Company; The Employers' Fire Insurance Company; Southeastern Agency Group and M.I.A. Company, Inc., individually and as successors to or f/k/a Merrimon Insurance Agency, Inc.; Robert E. Aspray; Nell Ashworth, individually and as personal representative of the Estate of Robert J. Ashworth; Betty C. D'Amico, individually and as Executor of the Estate of Julian D'Amico, JR.; Kayla Keith, individually and as the personal representative of the Estate of Jerry W. Archer, SR; Richard L. Knight II, as personal representative of the Estate of Teddy L. Knight, SR, and Linda Knight, individually; David D. Rollins; James W. Smith; Frances R. Smith; and Linda J. White, individually and as personal representative of the Estate of Lubert R. White, JR., Defendants,

Of Which Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company and The Standard Fire Insurance Company are the Appellants.

Appellate Case No. 2021-000648

―――――――

Appeal From Richland County
Jean Hoefer Toal, Special Circuit Court Judge

―――――――

Opinion No. 6110
Submitted March 3, 2025 – Filed May 14, 2025

---

**AFFIRMED**

---

Matthew Todd Carroll, of Womble Bond Dickinson (US) LLP, of Columbia; Mary Elizabeth O'Neill, of Womble Bond Dickinson (US) LLP, of Charlotte, North Carolina; and Harry Lee, of Washington, D.C., all for Appellants.

Jescelyn Tillman Spitz and Brian Montgomery Barnwell, both of Rikard & Protopapas, LLC, of Columbia; Peter George Currence, of McDougall, Self, Currence & McLeod, LLP, of Columbia; G. Murrell Smith, Jr., of Smith Robinson Holler DuBose Morgan, LLC, of Sumter; Shanon N. Peake and Jonathan M. Robinson, both of Smith Robinson Holler DuBose Morgan, LLC, of Columbia; John Belton White, Jr., Griffin Littlejohn Lynch, and Marghretta Hagood Shisko, all of John B. White, Jr., P.A., of Spartanburg; Christopher Rutledge Jones, of John B. White, Jr., P.A., of Columbia; and Bryan M. Killian, of Washington, D.C., all for Respondents.

---

**MCDONALD, J:** This is an action for declaratory judgment brought by the dissolved Starr Davis Company's appointed receiver, Peter Protopapas (Receiver), against two of Starr Davis's former insurers, Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company (Aetna) and Standard Fire Insurance Company. In this appeal, the appellant insurers challenge the special circuit court's grant of partial summary judgment; they assert the summary judgment order is premature, ignores the existence of genuine issues of material fact, and is premised upon a lack of admissible evidence. Appellants further contend the circuit court's coverage declarations are contrary to South Carolina law. We affirm the order of the special circuit court.

**Facts and Procedural History**

Starr Davis was founded in 1932 in Greensboro, North Carolina.  At its inception, the company "was involved in contracting and installing mechanical insulation for schools, churches, and small commercial or light industrial structures."  The company added wholesaling following World War II.  In 1962, Starr Davis further diversified its operations to include contracting, wholesaling, distribution, and fabrication throughout the southeastern United States.[1]  Starr Davis's promotional materials touted:

> Starr Davis Company, through its contracting division, performs insulation work both as a prime contractor to many industrial and commercial firms and as a sub-contractor to General, Plumbing, Heating, Air Conditioning, Refrigeration and Process Piping Contractors.

Eventually, Starr Davis became the subject of various asbestos-related claims.  The company had insurance coverage through Aetna and Standard Fire; both are now part of Travelers.

In 1985, Starr Davis and Aetna executed an interim agreement (Interim Agreement) addressing the management of asbestos claims.  This Interim Agreement provided, "Aetna afforded products liability/completed operations insurance coverage to Starr Davis from January 1, 1959, to June 30, 1985."  It further stated:

> Neither this Interim Agreement nor any part thereof shall be offered in evidence or used for any purpose in any court of law as support for the position being asserted by either party hereto in connection with the meaning, intent or construction of any insurance policy or policies issued by Aetna or purchased by Starr Davis.

On January 18, 2019, Charles and Rebecca Hopper, plaintiffs in an asbestos lawsuit, sought the appointment of a receiver for Starr Davis Company of S.C.,

---

[1] Starr Davis Company, Inc. filed South Carolina incorporation documents in 1963, and forfeiture documents in 1996.  Starr Davis Company of S.C., Inc., filed incorporation documents in 1962, and forfeiture documents in 1997.

Inc. and Starr Davis Company, Inc. The circuit court appointed the Receiver to administer Starr Davis's assets, including any available insurance assets, "as well as any claims related to the actions or failure to act of Starr Davis' insurance carriers."

Pursuant to the Receiver's request, the circuit court issued a subpoena to Travelers seeking copies of Starr Davis's Aetna and Standard Fire policies "as well as multiple other categories of documents, including underwriting and claims documents." Travelers initially declined to comply—arguing the subpoena was not properly served—and refused to produce the documents.

On May 14, 2019, Travelers produced copies of nine insurance policies in response to the subpoena's request for copies of policies issued between 1962 and 1992. One month later, Travelers produced copies of additional policies. In producing these responsive documents, Travelers reiterated it was not waiving its objections to the subpoena.

The Receiver subsequently filed a complaint for declaratory judgment and breach of contract against several defendants, including Travelers, Standard Fire, and Starr Davis's former insurance agency, Merrimon Insurance. Among other things, the Receiver requested that the circuit court declare which defendants are responsible for compensating the Receiver for the Starr Davis work, noting the primary beneficiaries of these efforts are the asbestos claimants and the defendant Insurers. The Receiver further sought declarations that it was entitled to copies of all insurance policies issued to Starr Davis and that Insurers have a duty to defend the asbestos lawsuits. With respect to any incomplete policy Insurers provided, the Receiver asked that the circuit court "declare the insurance policy and its coverage." And, the Receiver asserted that each primary insurer "has the burden to prove, based on the evidence, that an asbestos claim is either a 'products' claim or a 'completed operations' claim'" as defined in the policies "in order to subject the claim to the aggregate limits in the Starr Davis Insurance Policies, if any."

The Receiver moved for partial summary judgment, asserting Travelers had admitted it provided coverage to Starr Davis between 1959 and 1985. The Receiver cited the circuit court's previous rulings on the applicable coverage issues in asbestos litigation involving the dissolved Covil Corporation (the Covil Order)[2]

---

[2] On January 8, 2020, the circuit court issued a rule to show cause order in *Taylor v. Air & Liquid Systems Corp.*, No. 2018-CP-40-04940 (Richland, S.C., Ct. Com. Pl., Jan. 8, 2020) (the Covil case). There, the Receiver sought to hold various

and asked that the circuit court apply the coverage findings of its Covil Order in the current case. As part of this argument, the Receiver asserted the circuit court should decline to apply *In re Wallace & Gale Co.*, 385 F.3d 820 (4th Cir. 2004), in which the Fourth Circuit interpreted Maryland law, because *Wallace & Gale* was not binding in South Carolina. *Compare Wallace & Gale*, 385 F.3d at 834 ("Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer." (quoting *Bausch & Lomb v. Utica Mut.*, 625 A.2d at 1021, 1031 (Md. 1993))), *with Owners Ins. Co. v. Clayton*, 364 S.C. 555, 560, 614 S.E.2d 611, 614 (2005) ("Insurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability.").

The Receiver later filed an amended complaint asking that the circuit court interpret and declare the terms of the Travelers policies issued to Starr Davis, which the Receiver documented in coverage charts and schedules attached as an exhibit to the pleading. Travelers timely answered, asserted crossclaims against certain other insurers, and counterclaimed seeking its own declaratory relief related to the Starr Davis policies. Among other things, Travelers sought a declaration that based on the terms of the Interim Agreement, Travelers had no liability for asbestos-related bodily injury claims against Starr Davis prior to January 1, 1959, or after June 30, 1985.

Following a hearing, the circuit court granted the Receiver's motion for partial summary judgment. The circuit court found, "Following substantial and unexcused delay in complying with its basic discovery obligations under South

---

insurers in contempt for violating four court orders. The circuit court found insurers United States Fidelity and Guaranty Corporation (USF&G—now part of Travelers), Zurich American Insurance Company, and Sentry Insurance failed to produce requested insurance information to the Receiver despite multiple court orders requiring them to do so. The circuit court further noted a troubling USF&G policy of destroying insurance policies and other related documentation in an effort to evade liability. The circuit court found the supreme court's charge that it manage the statewide asbestos litigation docket required that the court reconstruct Covil's insurance policies. The circuit court's findings addressed the triggering of coverage, the distinction between operations and completed operations, the "burden of proving any coverage exclusion or limitation of coverage" (including aggregate limits and exhaustion of such coverage), occurrences, and the allocation of losses to Covil's various insurance policies.

Carolina law, Travelers ultimately produced liability insurance policies and evidence of liability insurance policies issued to Starr Davis." The circuit court also recognized secondary evidence establishing the relationship between Travelers and Starr Davis. It then referenced a troubling pattern of Travelers and its affiliated and subsidiary insurance companies regarding the destruction of insurance policies and related documentation in several asbestos cases.

The circuit court held Aetna issued primary coverage to Starr Davis for forty years from January 1, 1946, through April 30, 1986, subject only to a per occurrence limit for bodily injury. The circuit court declared the Aetna policies provided $11,900,000 in products/completed operations limits and $11,900,000 per occurrence in premises/operations limits, with no aggregate limit of liability for premises/operations claims or limit to the number of occurrences to which the policies would apply. The circuit court further found Aetna provided umbrella coverage from January 1, 1974, to May 1, 1983.

The circuit court held Standard Fire issued primary coverage to Starr Davis from January 7, 1974, to January 7, 1976, with "an unlimited supplemental defense obligation and separate annual products/completed operations limits" of $300,000 annual limits per occurrence and in the aggregate. From January 7, 1976, to May 1, 1980, Standard Fire issued annual policies with $500,000 in coverage per occurrence and in the aggregate. The circuit court found the referenced aggregate limit did not apply to operations claims.

The circuit court adopted the Receiver's requested declarations regarding the existence and terms of the Travelers policies, finding:

> 1. All of the Travelers policies summarized in the policy schedule below are either multiple-year policies or policies that were subject to annual renewal and all such policies issued by Travelers provide for a full separate limit of liability for product liability and completed operations claims and for premises/operations claims on a per occurrence basis for each annual period or portion thereof;
>
> 2. All of the primary insurance policies issued by Travelers have an unlimited supplemental duty to pay or reimburse defense costs;

3. The duty to pay or reimburse defense costs in these policies is "triggered" whenever there is any obligation that could potentially involve the policy coverage;

4. The duty to pay or reimburse defense costs is triggered by the allegations of a complaint asserted against Starr Davis;

5. In the unique case of Starr Davis, where multiple primary policies were issued for the same policy year, and multiple policies provide coverage for the same claim, Starr Davis may select one or both of the policies to respond to the claim and may "stack" the limits of such policies for each and every such claim;

6. The policy limits of successive Travelers primary or umbrella policies that respond to an asbestos suit may also be stacked to the extent necessary for the claimant to be paid in full for a Starr Davis liability;

7. The burden of proving any limitation or exclusion to coverage is on the insurer, here Travelers;

8. All of the Travelers liability insurance policies in effect from a person's first exposure to asbestos through manifestation of an asbestos-related disease or condition, and, ultimately, to death, cover the asbestos cases unless coverage is otherwise excluded under a policy;

9. The "completed operations hazard" described in Travelers' policies, and the corresponding aggregate limits of liability, apply *only* when a plaintiff is exposed to asbestos attributed to Starr Davis *after* Starr Davis completed its installation or removal operations or work at a particular jobsite;

10. The "products hazard" described in Travelers' policies, and the corresponding aggregate limits of liability, apply *only* when a plaintiff is exposed to asbestos attributed to Starr Davis *after* Starr Davis

relinquished possession of the products and placed them into the stream of commerce;

11. As to any individual asbestos lawsuit, it is Travelers' burden to prove that the suit seeks the recovery of damages that are subject to the aggregate limits of liability applicable to the "completed operations hazard" or "products hazard" provisions in its policies;

12. The asbestos insulation contracting, or "operations," claims against Starr Davis have resulted from multiple "occurrences" under the Travelers policies, thus entitling Starr Davis to multiple "per occurrence" limits of liability to satisfy its asbestos liabilities;

13. As to the asbestos "operations" claims against Starr Davis, Travelers is obligated to pay those claims "in full" up to its "per occurrence" limit of liability; and

14. While product liability or completed operations losses are subject to allocation on a "time-on-the-risk" pro rata allocation method, in light of its non-operating defunct status, no loss may be allocated to Starr Davis as part of any "time-on-the-risk" allocation scheme.

The circuit court's order also set forth charts listing Aetna policies issued from January 1, 1946, through April 30, 1986, and Standard Fire policies issued from January 7, 1974, through May 1, 1980.

Travelers moved to reconsider pursuant to Rules 6(a), 52(b), 59(e), and 62(b), SCRCP, initially arguing the circuit court had failed to address its argument that ruling on the partial summary judgment motion was premature because discovery, including document production, was ongoing. Travelers further asserted the circuit court's reliance on Starr Davis's submitted insurance policy charts was misplaced because the Receiver had provided the court with only two of the twenty-two policies referenced. Travelers also challenged the admissibility of the charts as well as the circuit court's handling of the Interim Agreement. The circuit court denied this motion, and Travelers timely appealed.

**Issues on Appeal**

I. Did the circuit court err in granting partial summary judgment and in declaring the existence and terms of missing insurance policies?

II. Did the circuit court err in finding the Interim Agreement was immaterial to the Receiver's motion for partial summary judgment?

III. Are the circuit court's coverage declarations contrary to South Carolina law?

**Standard of Review**

"In reviewing a grant of summary judgment, our appellate court applies the same standard as the trial court under Rule 56(c), SCRCP." *Woodson v. DLI Props., LLC*, 406 S.C. 517, 528, 753 S.E.2d 428, 434 (2014). Rule 56(c) "provides that the moving party is entitled to summary judgment 'if the [evidence before the court] show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Kitchen Planners, LLC v. Friedman*, 440 S.C. 456, 459, 892 S.E.2d 297, 299 (2023) (alterations in original) (quoting Rule 56(c), SCRCP).

**Analysis**

**I. Partial Summary Judgment**

Travelers first argues the circuit court erred in granting partial summary judgment and in issuing the insurance coverage declarations despite genuine disputes of material fact, a lack of admissible supporting evidence, and the need to complete ongoing discovery. Travelers further contends the Receiver failed to establish the existence, terms, and conditions of the "alleged" policies.

Although Travelers asserts the circuit court erred in making its coverage determinations based upon only the two policies the Receiver initially submitted, it merely claims the policies "likely changed significantly" over the years. Yet, it failed to submit evidence to support an inference that the policies did in fact change. And, while Travelers repeatedly argues about what other policies may or may not have provided, we note Travelers was in possession of its own policies when it responded to the Receiver's motion. Travelers contends the policies the Receiver submitted to the court include certifications that the polices are incomplete and are "missing forms and/or endorsements." But again, Travelers

provided these documents, and any issues regarding alleged missing policy forms or endorsements are the result of Travelers's failure to locate or produce them. This failure to either retain or produce the full policies—or to provide documentation as to whether coverage declarations or exclusions varied from year to year—necessitated that the circuit court fill in the gaps by piecing together what Travelers did produce.[3] As the circuit court properly recognized, "Insurance documentation is integral to the functioning of an insurance organization. It is not integral to the functioning of an insulation contractor."

Travelers contends the circuit court ignored evidence that the vast majority of Starr Davis's business activity involved product sales, not contracting, and claims additional discovery is necessary to determine when Starr Davis stopped handling asbestos for the purpose of analyzing operations claims. However, questions relating to what percentage of Starr Davis's business activity involved asbestos-containing materials or when it ceased activity involving asbestos-containing materials are inconsequential to the specific issues before us. The summary judgment order challenged here relates to the terms of the insurance coverage, and evidence in the record establishes that Starr Davis performed contracting work and sold asbestos-containing materials. Factual questions regarding whether Starr Davis was engaged in operations involving asbestos-containing materials at the time a particular plaintiff was injured will be fact-specific, but these questions are immaterial to our review of the policy language considered by the circuit court. To the extent such questions are arguably material to the matters before us, we note the claims records Travelers submitted with its opposition memorandum provide:

> The business of the named insured is steampipe and boiler insulation. They are engaged in approximately 90% of operation in sales of insulation materials, while 10% [is] in actual contracting work. Starr-Davis Company, Inc. is actually made up of two companies— Starr Davis of North Carolina and Starr-Davis of South Carolina. Main offices for both companies are in Greensboro, North Carolina. *Starr-Davis of South*

---

[3] We find inaccurate Travelers' assertion that the circuit court relied upon only two policies in making its findings. When Travelers objected to the Receiver's initial proposed order, it noted it had produced twenty-two primary liability insurance policies issued to Starr Davis. Thus, as contemplated by Rule 1006, SCRE, the Receiver filed under seal other underlying documentation produced by Travelers.

> *Carolina is involved primarily in installation and contract work.*

(Emphasis added). Accordingly, we reject these arguments.

## A. Charts and Rule 1006

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation, provided the underlying data are admissible into evidence. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court may order that they be produced in court.

Rule 1006, SCRE.

We find the circuit court acted within its discretion in relying on the Receiver's charts. Notably, Rule 1006, SCRE, requires only that the underlying data "presented in the form of a chart [or] summary" be admissible and be made available. Here, the charts the Receiver prepared and provided to the circuit court showing Starr Davis's insurance coverages were based on the policies Travelers produced during the discovery process. The charts list the policy dates, policy numbers, bodily injury occurrence and aggregate limits, named insured, and any policy notes. The Receiver attached two policies to its motion that included these policy terms, and additional evidence of insurance coverage was provided to the circuit court at a later date. This is precisely what Rule 1006 contemplates.

Additionally, we find Travelers has not demonstrated any potential prejudice resulting from the circuit court's reliance upon the Receiver's policy charts. Travelers failed to identify a specific policy or other documentation to which it would have objected as inadmissible or otherwise establish reversible error resulting from the circuit court's consideration of the charts under Rule 1006. This is especially so in light of the fact that Travelers had access to its own documents when the Receiver submitted the charts and supplemental Rule 1006 documents to the circuit court.

## B. North Carolina Law

Travelers next argues the circuit court erred in finding South Carolina law applies here without allowing the opportunity for discovery to determine whether South Carolina or North Carolina law should apply. We disagree.

Section 38-61-10 of the South Carolina Code (2015) states:

> All contracts of insurance on property, lives, or interests in this State are considered to be made in the State and all contracts of insurance the applications for which are taken within the State are considered to have been made within this State and are subject to the laws of this State.

The circuit court found that although Travelers asserted North Carolina law should apply to any consideration of the policies, it failed to identify any material conflict between the applicable South Carolina and North Carolina authorities. The circuit court further noted Travelers failed to mention the five primary policy periods covering North Carolina in its argument that North Carolina law should apply. For these reasons, the circuit court concluded it need not engage in a conflict of laws analysis because "[i]n the absence of any arguable conflict . . . reliance on South Carolina law is appropriate, including under the 'false conflict' doctrine."

We note Travelers has not identified any conflict between North Carolina and South Carolina law that might be relevant here. Moreover, Travelers has not identified nor argued how any of the circuit court's declarations might violate North Carolina law. *See Greer v. Spartanburg Tech. Coll.*, 338 S.C. 76, 79, 524 S.E.2d 856, 858 (Ct. App. 1999) ("Appellants have the burden of convincing this court the trial court committed error."). And as for Travelers' argument that "Starr Davis offered no admissible evidence that exposure to asbestos occurred at a South Carolina location and/or whether the claimants at issue were South Carolina citizens *at the time of the exposure*," we again find any such inquiry will turn upon the facts of a particular individual's claim.

## II. Interim Agreement

Travelers next argues the circuit court erred in refusing to consider the Interim Agreement in which Starr Davis agreed which policies existed and how the policies applied to asbestos claims. Again, we disagree.

"The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Whitlock v. Stewart*

*Title Guar. Co.*, 399 S.C. 610, 614, 732 S.E.2d 626, 628 (2012) (quoting *McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009)). "Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *Id.* 615, 732 S.E.2d at 628 at (quoting *McGill*, 381 S.C. at 185, 672 S.E.2d at 574).

The Interim Agreement states, "Neither this Interim Agreement nor any part thereof shall be offered in evidence or used for any purpose in any court of law as support for the position being asserted by either party hereto in connection with the meaning, intent or construction of any insurance policy or policies issued by Aetna or purchased by Starr Davis."

Addressing this argument, the circuit court found:

> Travelers relies *substantially* on the Interim Agreement in support of its opposition to the Motion—something Travelers' counsel repeated *several times* at the hearing on the Motion—concerning the "meaning, intent or construction" of the insurance policies memorialized by the Interim Agreement. These arguments violate the specific terms of the Agreement prohibiting the parties from using the document for this very purpose, and the Court admonishes Travelers and its counsel for reliance on admittedly inadmissible material in opposing the Motion. By contrast, Starr Davis uses the document only as evidence of the existence of the insurance policies, an appropriate use of the Interim Agreement.

The circuit court further found the terms of the Interim Agreement precluded Travelers's argument that "an open issue exists as to whether the parties have 'already agreed which alleged or missing policies provide coverage for the asbestos claims, and which do not.'"

We agree with the circuit court that the Interim Agreement is immaterial to deciphering the "meaning, intent or construction" of the insurance policies at issue. First, the Interim Agreement prohibits the use of the document as Travelers sought to use it here. And, by its own terms, the Interim Agreement addressed only products liability or completed operations coverage in stating, "Aetna has afforded products liability/completed operations insurance coverage to Starr Davis from

January 1, 1959 to June 30, 1985 and Starr Davis has been insured by other insurers or has been self-insured for the remainder of its existence. . . .".[4]

## III.  The Coverage Declarations

Citing four points of error, Travelers argues the circuit court disregarded the relevant policy language and record evidence in issuing coverage declarations contrary to South Carolina law.  First, Travelers challenges the court's allocation findings—i.e., how to apportion costs between an insured and its insurers in progressive injury cases spanning many years.  Second, Travelers challenges the court's categorization of "operations" claims subject to unaggregated coverage, as opposed to "completed operations" claims subject to aggregate liability limits.  Next, Travelers seeks reversal of the circuit court's findings that it bears the burden of proving both exclusions to and limitations on coverage.  And, finally, Travelers contends the circuit court erred in failing to consider the applicable policy language providing for a single "per-occurrence" policy limit.  We disagree.

"Insurance policies are subject to the general rules of contract construction." *Id.* (quoting *M & M Corp. of S.C. v. Auto-Owners Ins. Co.*, 390 S.C. 255, 259, 701 S.E.2d 33, 35 (2010)).  "This Court 'must enforce, not write, contracts of insurance and [ ] must give policy language its plain, ordinary, and popular meaning.'" *State Farm Mut. Auto. Ins. Co. v. Windham*, 438 S.C. 156, 161, 882 S.E.2d 754, 756–57 (2022) (alteration in original) (quoting *Fritz-Pontiac-Cadillac-Buick v. Goforth*, 312 S.C. 315, 318, 440 S.E.2d 367, 369 (1994)).

We agree with Travelers that the interpretation of insurance policies must begin with the policy language.  However, as discussed above, issues regarding the completeness of the insurance policies or evidence related to such are the result of Travelers's own failure to retain and produce complete policies to the Receiver. Evidence suggests Travelers and other insurers providing coverage for asbestos claims adopted a systematic policy of destroying insurance documentation; thus, Travelers cannot now complain that the policies it produced are incomplete when its own deliberate acts contributed to the alleged lack of a sufficient record.  Thus, we reject Travelers' argument on this point to the extent it is based upon the alleged insufficiency of the policy evidence before the circuit court.

---

[4] We note the record also includes a 1980 letter requesting that Starr Davis locate historical insurance documents.  In this letter, a claims representative admits that Aetna had insured Starr Davis since the 1940s.

## A. Time on the Risk

Travelers relies on *Crossmann Communities of North Carolina, Inc. v. Harleysville Mutual Insurance Co. (Crossman II)*, 395 S.C. 40, 717 S.E.2d 589 (2011), in arguing the circuit court issued allocation declarations contrary to South Carolina law. In *Crossmann*, our supreme court adopted a "time on the risk" approach for allocating damages among successive insurers in construction cases involving progressive property damage covered under standard commercial general liability (CGL) policies. *Id.* at 52, 717 S.E.2d at 595.

The *Crossmann* court explained,

> In our view, the "time on risk" approach best conforms to the terms of a standard CGL policy and to the parties' objectively reasonable expectations. In particular, the "time on risk" approach requires a policyholder to bear a pro rata portion of the loss corresponding to any portion of the progressive damage period during which the policyholder was not insured or purchased insufficient insurance.

*Id.* at 50, 717 S.E.2d at 594. "An analysis of the proper method for allocating a loss among successive insurers must begin with the threshold question of what must happen in order to trigger the potential for coverage under a particular policy." *Id.* at 51, 717 S.E.2d at 595.

> An ideal application of the "time on risk" approach would require the finder of fact to determine precisely how much of the injury-in-fact occurred during each policy period and precisely what quantum of the damage award in the underlying suit was attributable to that injury. Unfortunately, it is often "both scientifically and administratively impossible" to make such determinations.

*Id.* at 64, 717 S.E.2d at 601 (quoting *Bos. Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 301 (Mass. 2009)).

> In cases where it is impossible to know the exact measure of damages attributable to the injury that triggered each

policy, courts have looked to the total loss incurred as a result of all of the property damage and then devised a formula to divide that loss in a manner that reasonably approximates the loss attributable to each policy period. The basic formula consists of a numerator representing the number of years an insurer provided coverage and a denominator representing the total number of years during which the damage progressed. This fraction is multiplied by the total amount the policyholder has become liable to pay as damages for the entire progressive injury. In this way, each triggered insurer is responsible for a share of the total loss that is proportionate to its time on the risk.

This formula is not a perfect estimate of the loss attributable to each insurer's time on the risk. Rather, it is a *default rule* that assumes the damage occurred in equal portions during each year that it progressed. If proof is available showing that the damage progressed in some different way, then the allocation of losses would need to conform to that proof. However, absent such proof, assuming an even progression is a logical default.

In this case, a strict application of the basic "time on risk" formula might be inappropriate. There were numerous buildings involved in the underlying lawsuit against Crossmann, each with its own certificate of occupancy, and the parties have stipulated that the damage began "within 30 days after the Certificate of Occupancy was issued for each building." Further, the parties stipulated that the damage "progressed until repaired or until Beazer Homes paid to settle the underlying cases, whichever came first." Accordingly, it may be that, as to each building, each policy was "on the risk" for a slightly different proportion of the total damage period. We leave it to the sound discretion of the trial court to determine whether it is necessary to apply the "time on risk" formula separately to each individual building or whether, instead, it would be prudent to modify the default formula to arrive at a reasonable methodology for

this case. Thus, we emphasize that trial courts employing the "time on risk" approach may alter the default formula set forth above where a strict application would be unduly burdensome or otherwise inappropriate under the circumstances of a particular case. However, any such alterations must remain within the bounds of a pro rata/"time on risk" approach: the formula must result in a reasonable approximation of the amount of property damage that occurred during each insurer's policy period.

*Id.* at 64–66, 717 S.E.2d at 602 (footnotes omitted).

This court recently analyzed *Crossmann II* in *Portrait Homes-South Carolina, LLC v. Pennsylvania National Mutual Casualty Insurance Co.*, 442 S.C. 515, 900 S.E.2d 245 (Ct. App. 2023), *petition for cert. withdrawn and dismissed*, S.C. Sup. Ct. Order dated March 20, 2025. The *Portrait Homes* court explained:

In *Crossmann II*, our supreme court abandoned the joint and several/all sums approach for determining insurance coverage for progressive property damage cases because that approach ignored "critical language limiting the insurer's obligation to pay to sums that are attributable to property damage that occurred during the policy period." 395 S.C. at 60, 717 S.E.2d at 599. Our supreme court found that "the scope of an insurer's duty to indemnify was limited to damages accrued during the insurer's time on the risk, overruling earlier case law that held an insurer's liability was joint and several." *Harleysville Grp. Ins. v. Heritage Communities, Inc.*, 420 S.C. 321, 335, 803 S.E.2d 288, 296 (2017) (citing *Crossmann II*, 395 S.C. at 59–64, 717 S.E.2d at 599–601). "An ideal application of the 'time on risk' approach would require the finder of fact to determine precisely how much of the injury-in-fact occurred during each policy period and precisely what quantum of the damage award in the underlying suit was attributable to that injury." *Crossmann II*, 395 S.C. at 64, 717 S.E.2d at 601. "Unfortunately, it is often 'both scientifically and administratively impossible' to make such

determinations." *Id.* (quoting *Bos. Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 910 N.E.2d 290, 301 (2009)).

> In cases where it is impossible to know the exact measure of damages attributable to the injury that triggered each policy, courts have looked to the total loss incurred as a result of all of the property damage and then devised a formula to divide that loss in a manner that reasonably approximates the loss attributable to each policy period.

*Id.* at 64–65, 717 S.E.2d at 602.

However, our supreme court noted that "[t]his formula is not a perfect estimate of the loss attributable to each insurer's time on the risk. Rather, it is a default rule that assumes the damage occurred in equal portions during each year that it progressed." *Id.* at 65, 717 S.E.2d at 602. "If proof is available showing that the damage progressed in some different way, then the allocation of losses would need to conform to that proof. However, absent such proof, assuming an even progression is a logical default." *Id.* "[W]he[n] it is impracticable to calculate the exact measure of damages attributable to the injury that triggered each policy, the default rule is that an insurer's pro rata share of the damages is a function of the total number of years damages progressed and the portion of those years a particular insurer provided coverage." *Heritage Cmtys., Inc.*, 420 S.C. at 336, 803 S.E.2d at 296 (citing *Crossmann II*, 395 S.C. at 64–65, 717 S.E.2d at 602).

In *Crossmann Communities of North Carolina, Inc. v. Harleysville Mutual Insurance Co.* (*Crossmann III*), the trial court "computed the pro rata allocation [of damages] based on a daily loss rather than an annual loss" because one insurer had coverage for less than a year and another had coverage for less than two years. 411 S.C. 506, 522, 769 S.E.2d 453, 462 (Ct. App. 2015). This court found

the trial court did not err in the methodology it employed to calculate the time at risk.  *Id.*  The court noted, our supreme court in *Crossmann II* ruled that "the default rule is subject to alteration *at the discretion of the trial court*." *Id.*

*Portrait Homes-S.C*, 442 S.C. at 588–90, 900 S.E. 2d at 285–86 (alterations in original).  While recognizing the *Crossmann II* formula as the default rule, the *Portrait Homes* court emphasized that the trial court retains the discretion to alter this formula in appropriate circumstances.  *Id*.

As *Portrait Homes* recognized, our supreme court again addressed the applicability of a time on the risk in approach in *Harleysville Group Insurance v. Heritage Communities, Inc.*, a declaratory judgment action arising from litigation alleging the negligent construction of two condominium complexes.  There, the supreme court held the special referee did not err in finding punitive damages were not subject to a time on the risk approach.  420 S.C. at 356, 803 S.E.2d at 307.  The court noted, "A key point to the time-on-the-risk analysis is that this allocation method was developed as a means of apportioning actual, compensatory damages where the injury progressed over time."  *Id*. at 355, 803 S.E.2d at 307.  The court found that based on the facts of the case, punitive damages were not subject to a time on the risk allocation because the condominium developer neither contended nor presented any evidence that certain reprehensible acts upon which punitive damages were predicated occurred outside the relevant policy periods.  *Id*. at 356, 803 S.E.2d at 307.  "To the contrary, the evidence in the record demonstrate[d] that all of Heritage's reprehensible acts that justified the juries' imposition of punitive damages took place entirely during the period of time Harleysville's policies were effective."  *Id.*

Here, the circuit court recognized that Travelers issued liability insurance coverage to Starr Davis for **at least forty uninterrupted years** and Starr Davis was in receivership with no assets other than insurance coverage available to absorb its losses.  The circuit court further found "the language of the policies typically requires the insurers to pay 'all sums'—meaning everything—for which the insured is legally obligated to pay if a claimant sustains bodily injury during the period of the policy."

The circuit court then distinguished *Crossmann*, noting *Crossmann* "speaks generally to allocation of loss in a continuing construction property loss case" and

not to the issue here of operations coverage and "the impracticability of loss to Starr Davis itself":

> The Court also interprets *Crossmann* such that allocation of loss will not be made to policy years after 1986, when Starr Davis does not have any available or responsive coverage. Starr Davis lacks the ability to absorb loss allocations from Travelers, its liability insurer over a forty-year period. Allocation of loss from a judgment or settlement to an insured which cannot pay any portion of the judgment or settlement—especially when there is abundant insurance to pay for the loss but for a judicially-created allocation formula—is unproductive, as well as inequitable. The reason for a "time on the risk" allocation is to accomplish an "equitable" allocation. However, there is no "equity" in either driving an insured further into insolvency through a formulistic allocation method or by leaving a portion of a settlement or judgment unpaid. Nor is it "equitable" to apportion any loss to an insured in receivership when there is any responsive insurance.

Like the circuit court, we note *Crossmann*, and more recently *Portrait Homes*, dealt with property damage claims in the construction litigation context, not personal injury claims or asbestos operations claims. Travelers did not cite—and we have been unable to find—any South Carolina authority applying a time on the risk approach to asbestos operations claims. Perhaps more importantly, our supreme court has recognized, "The concept of time on the risk is a judicially created, equitable method of allocating progressive damages 'where it is impossible to know the exact measure of damages attributable to the injury that triggered each policy.'" *See Heritage Cmtys.,* 420 S.C. at 354, 803 S.E.2d at 306–07 (quoting *Crossmann II*, 395 S.C. at 64, 717 S.E.2d at 602). In asbestos cases, it is often impossible to determine the measure of damages attributable to a particular policy period because the concomitant bodily injuries do not manifest until many years later. And, an Aetna policy in the record specifically states:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence,

and the company shall have the right and duty to defend
any suit against the insured seeking damages on account
of such bodily injury or property damage . . . .

We acknowledge *Crossmann* rejected the "joint and several" approach taken in some jurisdictions in favor of a time on the risk approach as the default allocation method in progressive property damage cases, and we recognize the "joint and several" approach also finds an underpinning in the "all sums" or "those sums" language of certain CGL policies. *See Crossmann II*, 395 S.C. at 60, 717 S.E.2d at 599. Yet, like the special circuit court, we must consider the legal and equitable considerations involved in allocating loss to a policyholder lacking assets to pay when sufficient *decades-long* coverage exists *and* the insurance policies at issue contain this "all sums" language. Accordingly, we find the circuit court did not err in issuing the allocation declarations.

## B. Completed Operations

Travelers next argues the circuit court erred in finding any asbestos related bodily injury claims established against Starr Davis would fall outside the "completed operations" hazard, and thus, would not be subject to an aggregate liability limit. Travelers further notes that "if bodily injury falls within the 'products' or 'completed operations' category, as defined by the policies, the associated coverage under the policy is subject to an aggregate limit of liability, *i.e.*, the insurer's liability is capped at a certain amount for indemnity purposes no matter how many injuries, occurrences, claims or claimants are involved."

In declaring insurance rights and obligations, the circuit court differentiated between operations, products, and completed operations claims. The circuit court found the "completed operations hazard" aggregate limits applied only when a claimant was exposed to asbestos *after* Starr Davis completed its work at a particular jobsite. By contrast, work ongoing at the time of a claimant's exposure would be covered as an "operations" hazard. The circuit court declared, "In short, no aggregate limits of liability apply to suits seeking the recovery of damages for bodily injury where the plaintiff was exposed to asbestos while Starr Davis was performing work at a particular jobsite" and explained:

> The "completed operations hazard" is so named because
> it protects the insured against liability "caused by" or
> "arising out" of its "completed operations"—not its
> un-completed operations. Bodily injury caused by Starr

Davis' ongoing operations or ongoing work is an "operations" claim. Bodily injury caused by Starr Davis' completed operations or completed work is a "completed operations" claim. Bodily injury caused by Starr Davis' products after Star Davis relinquished possession of the products and place[d] them into the stream of commerce is a "products" claim.

An Aetna policy effective from January 1, 1978, to January 1, 1979—attached with the Receiver's motion for partial summary judgment—provides the following pertinent definitions:

> **"bodily  injury"** means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

> **"completed operations hazard"** includes **bodily injury** and **property damage** arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the **named insured**.

> "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

>> (1)  when all operations to be performed by or on behalf of the **named insured** under the contract have been completed,

>> (2) when all operations to be performed by or on behalf of the **named insured** at the site of the operations have been completed, or

>> (3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than

> another contractor or subcontractor engaged in
> performing operations for a principal as a part of
> the same project.
>
> Operations which may require further service or
> maintenance work, or correction, repair or replacement
> because of any defect or deficiency, but which are
> otherwise complete, shall be deemed completed.
>
> . . . .
>
> **"occurrence"** means an accident including continuous or
> repeated exposure to conditions, which results in **bodily
> injury** or **property damage** neither expected nor
> intended from the standpoint of the insured[.]

Travelers has failed to demonstrate how the circuit court's declarations contravene these policy terms. Despite Travelers' contention that the circuit court declared "nearly all asbestos-related injuries" fall outside the completed operations hazard, we see no such finding in the circuit court's order. Instead, the circuit court properly considered the language of the policies in differentiating between claims arising from "operations hazards" and "completed operations hazards." The policies plainly state the "completed operations hazard" applies only if the bodily injury occurred *after* the relevant operations were completed. It follows that whether a particular claim falls within the "operations hazard" or "completed operations hazard" will turn on the facts and chronology of a particular claimant's case. We therefore find Travelers has failed to show error in the circuit court's declarations addressing "operations" hazards versus "completed operations hazards."

## C. Burden to Prove Coverage Limitations

Travelers further contends the circuit court erred in finding it bears the burden of proving insurance coverage limitations because the definition of "hazard" implicates a limitation as opposed to an exclusion.

"[T]he initial burden to prove that a loss is covered under an insurance policy is on the insured, and once the insured has done so, the burden shifts to the insurer to prove that an exclusion applies to defeat coverage." *Ex parte Builders Mut. Ins. Co.*, 431 S.C. 93, 102, 847 S.E.2d 87, 92 (2020). "Insurance policy exclusions are

construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability." *Clayton*, 364 S.C. at 560, 614 S.E.2d at 614. Here, the circuit court found Travelers bears the burden of proving any exclusion or limitation of coverage—including the application of aggregate limits to specific cases—because aggregate limits for "products" hazards and "completed operations hazards" restrict coverage.

Initially, we note this case differs from standard CGL coverage cases because certain insurers in the asbestos coverage arena historically destroyed coverage documentation pursuant to an intentional scheme seeking to thwart legitimate claims. Thus, the circuit court was tasked with determining potentially applicable insurance coverage in part by extrapolating missing or incomplete terms from the policy documents still in existence.

We agree with the circuit court that requiring Starr Davis to prove a claim does *not* involve a "products" hazard or "completed operations" hazard would lead to impractical results not favored in South Carolina's longstanding insurance coverage jurisprudence. Under the circumstances here, and because the aggregate policy limits cap coverage, the burden must fall upon Travelers to prove which claims, if any, fall within a policy's aggregate limits or other limitations and exceptions to coverage.

## D. Occurrences

Finally, Travelers argues the circuit court failed to consider the policy language or facts necessary to determine what constitutes an "occurrence" under the Starr Davis polices. In Travelers's view, evidence regarding the portion of Starr Davis's business devoted to contracting operations is critical to this analysis.

Addressing these arguments, the circuit court found:

> All of the Travelers liability insurance policies in effect from a person's first exposure to asbestos through manifestation of an asbestos-related disease or condition, and ultimately, to death, cover the asbestos cases unless coverage is otherwise excluded under a policy.
>
> . . . .

The asbestos insulation contracting, or "operations," claims against Starr Davis have resulted from multiple "occurrences" under the Travelers policies, thus entitling Starr Davis to multiple "per occurrence" limits of liability to satisfy its asbestos liabilities . . . .

. . . .

The Travelers policies at issue provide coverage for legal liabilities resulting from an "occurrence."  An "occurrence" is typically defined as an accident, including continuous or repeated exposure to substantially similar conditions, that results in bodily injury during the policy period.  *See, e.g., Crossmann Cmtys. of N.C.*, [395 S.C. at 47–48, 717 S.E.2d at 592–93].  The Court understands Starr Davis' motion to be seeking a multiple occurrence ruling only as respects "operations" claims, and not "completed operations" claims or "products" claims.

The circuit court rejected Travelers's comparison of asbestos operations cases to products cases as well as its argument that all operations cases must necessarily arise from a single occurrence, finding Starr Davis's operations cases differ from cases alleging liability for the placing of products in the stream of commerce. Instead, the circuit court found cases alleging Starr Davis's operations exposed claimants to asbestos constituted multiple occurrences under the standard definition of "occurrence."

A sample policy submitted with the partial summary judgment motion provides:

"**occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the insured[.]

This policy also states "that **bodily injury** and **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."  Travelers contends this language required the circuit court to determine whether plaintiffs exposed to "substantially the same general conditions" suffered only one policy "occurrence."

Our supreme court addressed similar policy language in the context of a products liability claim when answering the certified question in *Owners Insurance Co. v. Salmonsen*, 366 S.C. 336, 339, 622 S.E.2d 525, 526 (2005). In this coverage litigation arising from defective stucco distributed by the insured (CGD), the court considered two methods for addressing the meaning of "occurrence":

> As discussed in various treatises, the majority rule in interpreting the meaning of "occurrence" in a liability policy is the so-called "cause test" which focuses on the cause of the damage rather than the number of claimants or injuries. The minority view, on the other hand, focuses on the effect of the insured's action and considers each event or each injury a separate occurrence.

366 S.C. at 338, 622 S.E.2d at 526. The court then held:

> There is no indication CGD defectively distributed the product in question. Further, the policy here provides coverage for an "occurrence" including a "continuous and repeated exposure to substantially the same general harmful conditions." Because the distributor has taken no distinct action giving rise to liability for each sale, we conclude under this policy definition that placing a defective product into the stream of commerce is one occurrence.

*Id.* at 339, 622 S.E.2d at 526.

Although Travelers urges application of the "cause test" as referenced in *Salmonsen*, we note several states using this test in the products liability context have declined to apply it in this manner in the asbestos operations context. *See Com. Union Ins. Co. v. Porter Hayden Co.*, 698 A.2d 1167, 1211 (Md. Ct. Spec. App. 1997) (agreeing that the injury-causing event is "exposure to asbestos fibers"); *Nat'l Indem. Co. v. State*, 499 P.3d 516, 542 (Mont. 2021) (agreeing the cause of injury was not the State's "singular decision" but "its separate failures to warn" mine workers exposed to asbestos); *U.S. Mineral Prods. Co. v. Am. Ins. Co.*, 792 A.2d 500, 510 (N.J. Super. Ct. App. Div. 2002) (holding progressive injury or damage from asbestos exposure is an "occurrence" within each year of excess CGL policy under the contiguous-trigger theory); *Hopeman Bros., Inc. v. Cont'l Cas.*

*Co.*, 307 F. Supp. 3d 433, 459 (E.D. Va. 2018) (applying New York law and seeing no "tension between an all sums allocation method and a finding that each asbestos claimant constitutes a separate occurrence"); *Appalachian Ins. Co. v. Gen. Elec. Co.*, 863 N.E.2d 994 (N.Y. 2007) (agreeing that "under the terms of the GE primary insurance policies, the claims present[ed] multiple occurrences"); *LuK Clutch Sys., LLC v. Century Indem. Co.*, 805 F. Supp. 2d 370 (N.D. Ohio 2011) (finding that for purposes of insurer's limit of liability, asbestos claims against insured constituted multiple occurrences).

Here, the special circuit court found bodily injury claims arising from Starr Davis's operations involved multiple occurrences. We agree, and we note the extent to which the facts underlying a particular plaintiff's exposure and progressive injuries may or may not have arisen from "substantially the same general conditions" will require a court to focus on each individual claimant's exposure on a case-by-case basis. The challenged circuit court order does not preclude such an analysis.

**Conclusion**

Based on the foregoing, the order of the special circuit court is

**AFFIRMED.**

**THOMAS and VINSON, JJ., concur.**